GOLBERG SEGALLA, LLP
*Attorneys For Defendant*
By Brian T. Stapleton, Esq. (CT13418)
100 Pearl Street
Hartford, CT 06103
(860) 241.0063 – tel
(860) 241-0062 – fax
bstapleton@goldbergsegalla.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARTIN LUCAS & CHIOFFI, LLP, | : | Civil Action No.: 3:08-CV-01388 (MRK) |
| Plaintiff, | : | |
| -against- | : | |
| BANK OF AMERICA , NATIONAL ASSOCIATION, | : | |
| Defendant. | : | November 30, 2009 |

### LOCAL RULE 56(a)1 STATEMENT

Defendant **BANK OF AMERICA, NA** ("Defendant"), pursuant to D. Conn. L. Civ. R. 56(a)1, respectfully submits that there is no genuine issue to be tried as to the following material facts:

1.      This case arises out of a safe deposit agreement between plaintiff Martin Lucas Chioffi, LLP ("MLC" or "plaintiff") and Fleet Bank, the predecessor in interest to defendant Bank of America ("BOA" or "the bank" or "defendant").

2.      Plaintiff is a law firm located in Stamford, and the BOA banking center at issue is located on Greenwich Avenue in Greenwich.

**About Martin Lucas Chioffi, LLP and BOA**

3.      As a law firm, Martin Lucas Chioffi LLP advertises its "extensive business experience" to the public via its website.  (See, http://www.mlc-law.com. For ease of reference, several screen clippings of the MLC website are attached here as Exhibit A).

4.      In its own words, MLC's "extensive business experience" encompasses "all principal areas of law affecting businesses," including emerging businesses, mergers and acquisitions, executive compensation, employment law, taxation, corporate finance, intellectual property, securities law, and venture capital/private equity. Id.

5.      Christopher Martin, Esq., is the founder of MLC and its Managing Partner. Id. See also, resume of Christopher Martin. Esq., taken from the MLC website and attached here as part of Exhibit A.

6.      Mr. Martin is the leader of MLC's Business Group, and his law practice focuses on domestic and international corporate tax law, including the "formation and growth of emerging businesses, mergers and acquisitions, executive compensation, taxation, corporate finance, intellectual property, private securities offerings and venture capital." Id.

7.      Mr. Martin holds degrees law and accounting, has been practicing law since 1988, and is also a Certified Public Accountant. Id.

8.      BOA is one of the nation's oldest banks, dating back to 1784, and is the country's third-largest lender.  See, Affidavit of Jonathan Schmid, attached hereto as Exhibit B, at p.2, ¶¶ 7–9.

9.      Headquartered in North Carolina, BOA has a nation-wide network of 5,700 branches and holds assets with an estimated worth of $966 billion. Id.

**About the Day-to-Day Arrangement Between MLC and the Bank**

10.     On or about November 30, 1999, MLC (then known as Martin, Lois Gasparrini) executed a Safe Deposit Box Contract with Fleet Bank. Complete copies of the Safe Deposit Box Contract ("the Contract") and Safe Deposit Box Rules and Regulations ("the Rules") are attached hereto as <u>Exhibit C</u>. See also, excerpted copy of deposition transcript of Mark Chioffi dated August 27th, 2009, attached hereto as <u>Exhibit D</u>, at pp. 52-55, 70-74.

11.     Prior to executing the Contract, MLC investigated several other storage options. <u>Exhibit D</u>, pp. 65-66.

12.     Despite the title of the Contract, it did not involve a traditional "safe deposit box" arrangement as may be commonly understood (i.e., wherein access to a safe deposit box of a given size was granted by Fleet and Fleet provided one set of keys to that box to MLC, with both Fleet and MLC holding keys to the same box). <u>Exhibit B</u>, p.2, ¶ 11; <u>Exhibit D</u>, at pp. 52-55, 70-74.

13.     Instead, pursuant to the Contract MLC merely rented floor space in one of Fleet's three (3) basement vaults. <u>Exhibit B</u> at p.2, ¶ 11; <u>Exhibit D</u> at 52-55, 70-74.

14.     MLC moved several of its own metal cabinets into the vault, kept various client property inside the cabinets, and added or removed its' clients' property whenever it saw fit to do so. <u>Exhibit B</u> at p.2, ¶ 13; <u>Exhibit D</u> at 52-55, 70-74, 77-79.

15.     The cabinets were secured by MLC in several different ways. <u>Exhibit B</u> at pp.2-3; <u>Exhibit D</u> at 70-74.

16.     First, the cabinet drawers had locks built into them, and only MLC had the keys to these drawer locks. <u>Exhibit B</u> at p.3, ¶ 15; <u>Exhibit D</u> at 70-74.

17.     In addition, MLC hired a locksmith to install bars across the fronts of the cabinets, which were also secured by locks.  Again, only MLC had the keys/combinations to these additional locks. <u>Exhibit B</u> at p.3, ¶ 16; <u>Exhibit D</u> at 74-75.

18.     Unless MLC provided keys to these locks to Fleet or BOA (which it never did), there was no way that anyone from Fleet could open the cabinet drawers. <u>Exhibit B</u> at p.3. ¶ 17; <u>Exhibit D</u> at 74-76.

19.     Consistent with this fact, MLC alone determined who could access the cabinets. <u>Exhibit B</u> at p.3, ¶ 18; <u>Exhibit D</u> at 74-76, 77-79.

20.     Pursuant to a "Safe Deposit Box Certificate of Access and Indemnification" that was periodically submitted to the bank by MLC, MLC identified by name and signature those particular individuals who had MLC's permission to access the MLC cabinets. (Copies of these Safe Deposit Box Certificates of Access are attached hereto as <u>Exhibit E</u>). See also, <u>Exhibit D</u> at 55-59.

21.     The Rules limited the contents of the box to only those items that were legal and safe (e.g., explosives were not permitted, nor were nuisance items).  See <u>Exhibit C</u>, Rules and Regulations, p.5, ¶ 20.

22.     Otherwise, MLC alone determined what – if anything – was put into and/or taken out of the cabinets.  <u>Exhibit B</u> at 3, ¶ 21; <u>Exhibit D</u> at 77-79, 81-84.

23.     At no time was MLC ever required to provide Fleet or BOA with an inventory or other description of the items placed within these cabinets, and has never done so.  <u>Exhibit B</u> at p.3, ¶ 22; <u>Exhibit D</u> at 81-84.

24.     MLC has never been required to provide Fleet or BOA with a description of an item's location within a given cabinet (e.g., whether a particular item was placed in a top drawer or a bottom drawer), and has never done so. <u>Exhibit B</u> at p.3, ¶ 23; <u>Exhibit D</u> at 81-84.

25.     The Bank limited customer access to the vault only by virtue of its business hours. <u>Exhibit B</u> at p.3, ¶ 24.

26.     Aside from opening the vault doors in the mornings, and locking the vault doors at night, the Bank did not prevent any authorized MLC representative to access the MLC cabinets at any time. <u>Exhibit B</u> at p.3, ¶ 25.

27.     Thus, as long as the bank was open for business, MLC alone determined when its client's property was put into or removed from the cabinets, and  where within those cabinets the property was placed. <u>Exhibit B</u> at p.4, ¶ 26; <u>Exhibit D</u> at 81-84.

28.     On those occasions when MLC would access its cabinets, it would do so alone: although Bank representatives escorted MLC agents to the vault door, they would not go inside with those reps when client property was being accessed but waited outside the vault while MLC conducted its business. <u>Exhibit B</u> at p. 4, ¶ 27; <u>Exhibit D</u> at 81-84.

29.     MLC did not have exclusive access to the vault into which it placed its cabinets; other law firms had cabinets placed in the same vault.  <u>Exhibit B</u> at p.4, ¶ 28; <u>Exhibit D</u> at 143-147; <u>Exhibit G</u> at 4.

30.     At no point in time  - either when the contract was signed or thereafter – was MLC ever a banking customer of Fleet or BOA: it had never held any professional checking, savings or trust accounts with Fleet or BOA. <u>Exhibit B</u> at p.4, ¶ 29.

31.     Thus, the only contact MLC representatives had with Fleet or BOA at the Greenwich Avenue location was on those occasions when MLC would access the cabinets in the basement. Exhibit B at p.4, ¶ 30.

32.     According to a "Safe Deposit Box Record of Access Card" (a copy of which is attached hereto as Exhibit F), MLC accessed its cabinets infrequently.  For example, MLC accessed its cabinets nine (9) times in the year 2004 (i.e., less than once per month), seven (7) times in the year 2005, five (5) times in the year 2006 and three (3) times in the year 2007. Id.

33.     In contrast, the other law firms who rented vault space in the basement visited the vault on a weekly, and sometimes daily basis.  Exhibit B at p.4, ¶ 32.  See also, Affidavit of Wilfredo Magan, attached hereto as Exhibit G, at p.4, ¶¶ 26-27.

34.     These other firms were also regular banking customers of Fleet / BOA. Exhibit B at p.4, ¶ 33; Exhibit G at p.4, ¶ 27.

**About the History and Nature of the Safe Deposit Service offered by Fleet**

35.     As a general matter, the vault rental space arrangement at issue was originated by Fleet Bank decades before BOA took over Fleet operations.  Exhibit B at p.5, ¶ 34.

36.     When BOA took over Fleet operations, it inherited the arrangement. Exhibit B at p.5, ¶ 35.

37.     BOA has never offered this type of service to its customers, either at the time it took over Fleet operations or at present.  Exhibit B at p.5, ¶ 36.

38.     Were a customer of BOA or a member of the general public to request such a service, BOA would refuse it. Exhibit B at p.5, ¶ 37.

39.     BOA continued to the service only as an accommodation to those customers who had an existing arrangement with Fleet prior to the BOA-Fleet merger. Exhibit B at p.5, ¶ 38.

40.     BOA currently charges a nominal annual fee for the service of $150 per cabinet (or $12.50 per month). <u>Exhibit B</u> at p.5, ¶ 39.

**About the Terms of the Safe Deposit Box Contract & Rules**

41.     The Contract expressly provided that it was to be governed by the Bank's Safe Deposit Box Rules and Regulations "in effect at any time."  See, Safe Deposit Box Contract, <u>Exhibit C</u>. See also, <u>Exhibit D</u> at 63-65.

42.     The Contract also expressly provided that the Bank could amend the Rules at any time, without notice, and that any such amendments would govern the Contract. <u>Id</u>.

43.     The Contract was signed on behalf of MLC by attorney Christopher Martin, a Managing Member and co-owner of the law firm.  <u>Exhibit C</u>; <u>Exhibit D</u> at 54-55.

44.     By his signature, Mr. Martin agreed to these terms of the Contract, and acknowledged receipt of the Rules and Regulations. <u>Id</u>.

45.     According to the Contract, the Bank expressly denied its status as an insurer of the contents of the safe deposit box and advised customers to obtain their own insurance. <u>Id</u>.

46.     Pertinent sections of the Contract read as follows:

*THE BANK DOES NOT PROVIDE INSURANCE COVERAGE FOR THE CONTENTS OF YOUR SAFE DEPOSIT BOX.  YOU MAY, AT YOUR OWN EXPENSE, SECURE YOUR OWN INSURANCE. YOU SHOULD KEEP A COMPLETE LIST AND DESCRIPTION OF ALL PROPERTY STORED IN YOUR SAFE DEPOSIT BOX AND ANY AVAILABLE PROOF OF OWNERSHIP*.

See, <u>Exhibit C</u>, Safe Deposit Box Contract.

47.     The Rules repeated that the Bank was not an insurer of the contents of the safety deposit box and advised the customer to obtain its own insurance:

*Important Notice Regarding Insurance and Inventory.  Fleet Bank does not provide insurance coverage to protect you against any loss or damage to the contents of the Safe Deposit Box.  For your protection, you may, at your own*

> *expense, secure your own insurance for the contents from an insurance company*
> *of your choice. You should keep a complete list and description of all property*
> *stored in your Safe Deposit Box, and any available proof of ownership.*

See, Exhibit C, Safe Deposit Box Rules and Regulations, p.1, un-numbered ¶ 2.

48.      MLC did, in fact, have a policy of casualty insurance issued by Travelers that,

*inter alia*, covered any loss to the client property contained within the cabinets. Exhibit D, at 63,

67-69.

49.      After its files were damaged, MLC submitted a claim to Travelers and received

reimbursement in the amount of Twenty Five Thousand Dollars ($25,000). Exhibit D, at 63, 67-

69.

50.      In addition, the Rules contained an exculpatory clause that defined both the duties

and liabilities of the Bank with respect  to the contents of the safe deposit box:

> *Landlord/Tenant. The relationship between the Bank and a Renter shall be that of*
> *landlord and tenant, except as provided for in paragraph 19, and the bank's only*
> *duty will be to use ordinary care to prevent unauthorized persons from gaining*
> *access to the Safe Deposit Box.  We will not be liable to you, unless we fail to*
> *exercise ordinary care in restricting Safe Deposit access to Authorized Persons*
> *during the term of your lease.*

See, Exhibit C, Safe Deposit Box Rules and Regulations, p.1, ¶ 1.

51.      The vaults are secured by lock and key, by wired alarms, and are also

under digital video surveillance monitored by BOA security teams.  Additionally, the

vaults are monitored on a 24-hour a day/ seven day a week basis by ADT for heat

variations and motion detection.  Exhibit B at p.5, ¶ 40.

## About the Water Intrusion of June 8th, 2007

52.      After executing the Contract, MLC stored client property in the basement of the

Bank for many years without incident. Exhibit B at p.5, ¶ 41.

53.     Sometime after the Bank closed on Friday June 8th, 2007 (either during the evening hours of the 8th or the morning hours of Saturday, June 9th), a water pipe in the Bank burst. <u>Exhibit B</u> at p.5, ¶ 42; <u>Exhibit G</u> at p.2, ¶8.

54.     The pipe failure caused a toilet in the Bank Manager's office to overflow.  <u>Exhibit B</u> at p.5, ¶ 43; <u>Exhibit G</u> at p.2, ¶ 9.

55.     The office was located directly above the vault containing MLC's cabinets;  the overflowing water eventually penetrated the ceiling above the vault, ran down the walls into the basement and collected on basement floor (including the floor inside the vault where MLC had its cabinets). <u>Exhibit B</u> at p.5, ¶ 44; <u>Exhibit G</u> at p.2, ¶ 10.

56.     The flooding water was not detected until the morning of Saturday, June 9th, 2007, when BOA employee Wilfredo Magan went to the basement to open the vaults for the day. <u>Exhibit B</u> at p.6, ¶ 45; <u>Exhibit G</u> at p.2, ¶ 11.

57.     Upon entering the basement, Mr. Magan  observed water flowing from the furnace room located next to the vault. <u>Exhibit B</u> at p.6, ¶ 46; <u>Exhibit G</u> at p.2, ¶ 12.

58.     He inspected the furnace room, and determined that the water was flowing down the furnace room walls. <u>Exhibit B</u> at p.6, ¶ 47; <u>Exhibit G</u> at p.2, ¶ 13.

59.     Recalling the bathroom above the furnace room, he immediately went upstairs to inspect the bathroom, and found the toilet overflowing. <u>Exhibit B</u> at p.6, ¶ 48; <u>Exhibit G</u> at p.2, ¶ 14.

60.     He immediately turned off the water to the toilet, and then called the BOA emergency clean-up number to have a maintenance crew come and clean up all the water. <u>Exhibit B</u> at p.6, ¶ 49; <u>Exhibit G</u> at p.2, ¶ 15.

61.     The maintenance crew came right away and immediately began cleaning up the water. Exhibit B at p.6, ¶ 50; Exhibit G at p.3, ¶ 16.

62.     During the course of the clean-up, it was discovered that water had also penetrated one of the vaults. Exhibit B at p.6, ¶ 51; Exhibit G at p.3, ¶ 17.

63.     The particular vault was therefore immediately opened and cleaned: the water was vacuumed out, large fans were placed to remove excess moisture, a dehumidifier was placed in the vault and tarps were placed over the cabinets. Exhibit B at p.6, ¶ 52; Exhibit G at p.3, ¶ 18.

64.     There had never been a prior incident of a water pipe failing. Exhibit B at p.6, ¶ 53; Exhibit G at p.3, ¶ 19.

65.     There was no prior indication that the pipe within the walls was about to burst: no water flow interruptions, no toilet problems, no water stains on the walls or floors or ceilings, no dripping walls or leaking ceilings. Exhibit B at p.6, ¶ 54; Exhibit G at p.3, ¶ 20.

66.     The water clean-up took place on Saturday, June 9th, 2007, and continued for several days thereafter. Exhibit B at p.7, ¶ 55; Exhibit G at p.3, ¶ 21.

67.     On the Monday following the leak, a repair crew was called to the Bank to fix the problem that caused the leak. Exhibit B at p.7, ¶ 56; Exhibit G at p.3, ¶ 22.

68.     The repair crew determined that a pipe within the ceiling above the vault area had deteriorated due to age and failed. Exhibit B at p.7, ¶ 57; Exhibit G at p.3, ¶ 23.

69.     MLC learned of the flood on September 5th, 2007, when MLC representatives discovered that files stored in one of the bottom drawers of a file cabinet were damp.

70.     MLC now claims that a sub-section of the files contained within these cabinets were damaged to the point of client signatures being washed away and needing to be re-executed, and is seeking compensation for the same.

**About the Plaintiff's Complaint and Theories of Liability**

71.     MLC subsequently filed suit under the following theories of liability: Breach of Contract (Count One), Breach of Covenant of Good Faith and Fair Dealing (Count Two), Promissory Estoppel (Count Three), Negligence/Bailment (Count Four) and CUTPA (Count Five). (A copy of plaintiff's Complaint has been filed with the Court as ECF Document No. 1 dated 09/12/08).

72.     The principal witness in support of these claims is attorney Mark Chioffi, an owner of MLC and the partner whose client property occupied the cabinets stored in the BOA vaults. Exhibit D.

73.     In support of its Breach of Contract theory, plaintiff claims that the "Defendant's failure to safeguard the documents entrusted to defendant in accordance with the terms of the 'Safe Deposit Box Contract' constituted a breach of its obligations under said contract…"  See, Plaintiff's Complaint, ECF Document No. 1, p.5, ¶ 24.

74.     In support of Count Two, plaintiff claims simply that "Defendant breached the covenant of good faith and fair dealing inherent in every contract,"  but does not specify how this breach came about. Id., p.5, ¶ 26.

75.     In support of its Promissory Estoppel theory, plaintiff claims that "during the period 1999 through 2007, defendant maintained the impression for plaintiff that the 'will vault' was safe and secure, and that plaintiff's file cabinets  in which it documents stored therein [sic] were being monitored and looked after by the Bank.  These representations by defendant to plaintiff were made to induce the plaintiff to rely thereon and plaintiff did so to its detriment."  According to plaintiff, the Bank is "stopped from contesting, and is  bound by, said

representations."  Plaintiff claims that "as a result of defendant's conduct, plaintiff has suffered and will continue to suffer" harm. Id., p.5, ¶ 29 – p.6, ¶ 30.

76.    Nowhere within Count Three does plaintiff specify *how* any representations as to the Bank's security measures were breached, how the Bank is now seeking to "contest" or otherwise repudiate any representations it may have made about its security measures, or how plaintiff has suffered harm due to inadequate security measures at the Bank. Id.

77.    In support of its Negligence / Bailment theory, plaintiff claims that "a bailment was created upon the defendant agreeing to store plaintiff's documents" and that defendant "failed to protect the property placed in its custody by plaintiff." Id., p. 6, ¶¶ 33-34.

78.    The causation element of plaintiff's negligence theory focuses on the lapse in time between the flood and MLC learning about it:  MLC claims that BOA negligently permitted / failed to prevent the flood from taking place (Exhibit D, pp.115-118),  failed to timely notify it of the flood, and that this failure is the reason why the signatures on the documents could not be recovered.  Exhibit D, pp.144-147.

79.    During his deposition, Mr.  Chioffi admitted that he has no evidence to support the "prior notice" element of his negligence claim.  Exhibit D, at pp. 76, 117.

80.    Mr. Chioffi also admitted that he has no evidence – expert or otherwise – to support his contention that the lapse in time between the flood and MLC's discovery was the reason the client signatures could not be recovered.  Exhibit D, pp. 144-147

81.    Mr. Chioffi also admitted that he has no evidence – aside from his own personal opinions  -  to support his theory that the Bank knew or should have known about an impending water leak. Exhibit D, at pp. 115-118.

82.     In support of its CUTPA claim, plaintiff alleges that the water leak incident and the Bank's failure to notify MLC more promptly of the leak was "illegal, immoral, unethical, oppressive, unscrupulous, and offensive of public policy."   See, plaintiff's Complaint, ECF Document No. 1, p.7, ¶ 38.

83.     During his testimony, Mr. Chioffi asserted his belief that the Bank intentionally caused water damage to his client's property, intentionally failed to notify MLC of the flood, and actually *wanted* Martin Lucas Chioffi to be damaged by the water leak.   [emphasis added]. Exhibit D, at pp. 111-115.

84.     Despite these beliefs, and despite the filing of this lawsuit, MLC continues to store its cabinets – and its client's property - in the basement vaults of  BOA. Exhibit D, at pp. 102-103.

85.     During his deposition testimony, Mr. Chioffi acknowledged the availability of other suitable storage options besides that being offered by BOA, and admitted that – despite the flood – MLC has chosen to keep its files in the BOA vault at Greenwich Avenue. Exhibit D, pp.106-107.

86.     Jonathan Schmid and Wilfredo Magan attributed the length of time it took them to notify MLC about the flood to the fact that neither man knew who MLC was, or in which of the three (3) basement vaults MLC stored its cabinets. Exhibit B at pp.7-8; Exhibit G at pp.4-6.

87.     The other entities who utilized the "vault access" service were regular banking customers of BOA who visited the vault quite frequently: at least weekly and sometimes daily. Exhibit B at p.7, ¶¶ 60-61; Exhibit G at p.4, ¶¶ 26-27.

88.     In fact, one of these customers actually visited the banking center to access the vaults on the day the flood was discovered. Exhibit B at p.7, ¶ 62; Exhibit G at p.4, ¶ 28.

89.     In contrast, neither Mr. Schmid nor Mr. Magan had ever personally escorted anyone from MLC down to the vault area in order to access MLC's cabinets. Exhibit B at p.7, ¶ 60; Exhibit G at p.4, ¶ 26.

90.     For this reason, the other law firms who stored cabinets in the vaults were immediately notified about the flood.  Exhibit B at p.7, ¶ 63; Exhibit G at p.4, ¶ 29.

91.     MLC was not a regular banking customer, and visited the vault on a relatively infrequent basis:  the first time MLC visited the banking center to access the cabinets after the flood was three (3) months later, and it was only then that it learned of the flood's occurrence. Exhibit B at p.8, ¶ 64; Exhibit G at p.4, ¶ 30.

92.     In addition, the record-keeping system used by BOA pertaining to this particular "vault access" arrangement did not specify the particular vault in which firms stored its cabinets. Exhibit B, p.8, ¶ 65; Exhibit G, p.4, ¶ 31.

93.     In other words, the records maintained by BOA did not specify that MLC, for example, kept three (3) cabinets in Vault 1, four (4) cabinets in Vault 2, and two (2) cabinets in Vault 3.  Id.

94.     Instead, the records merely indicated that cabinets were kept in the vaults, and indentified who was authorized to access those cabinets.  Id

95.     For this reason, too,  neither Schmid nor Magan were aware that MLC had stored cabinets in the vault that flooded. Exhibit B at p.8, ¶¶ 66-67; Exhibit G at p.5, ¶ 33.

96.     Neither Mr. Magan nor Mr. Schmid harbor any ill will, malice or other hostile intent toward MLC.  Exhibit B at p.8, ¶ 67 – p.9, ¶ 69; Exhibit G at p.5, ¶ 35.

97.     Any lapse in time between the flood and MLC learning of it is attributable solely to the fact that no one at the BOA banking center was familiar enough with MLC as an entity to

notify it immediately that the flood had taken place.  Exhibit B at p.9, ¶ 69; Exhibit G at p.5, ¶ 35.

98.    In short, BOA did  not know enough about MLC to even identify it as a vault customer, let alone to wish MLC harm in any way. Id.


THE DEFENDANT,
BANK OF AMERICA, NA,

_____/s/ Brian T. Stapleton_____
By: Brian T. Stapleton, Esq. (CT13418)
GOLDBERG SEGALLA LLP

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Local Rule 56(a)1 Statement** was filed with the U.S. District Court for the District of Connecticut electronically via the District Court's CM/ECF filing system on the 30th day of November, 2009, and that pursuant to such filing a true and correct copy of the filed document was automatically and electronically served on the following CM/ECF participant. In addition, a true and correct copy of the foregoing was served upon the following by deposit in the United States mail, first class postage prepaid, this 30th day of November, 2009:

MARTIN, LUCAS & CHIOFFI, LLP
Mr. Scott Lucas, Esq.
177 Broad Street
Stamford, CT 06901
***Attorneys for Plaintiff***

_____/s/ Brian T. Stapleton_____
Brian T. Stapleton, Esq. (CT13418)