# EXHIBIT "B"

# AFFIDAVIT

STATE OF CONNECTICUT    }
                        } ss:
COUNTY OF FAIRFIELD     }

**JONATHAN SCHMID**, after being duly sworn, does depose and state the following to be true under the penalties of perjury:

1. I am over the age of eighteen (18) and believe in the nature of an oath.

2. I am not personally named as a party to the litigation in which this Affidavit is being submitted.

3. I submit this Affidavit in support of Bank of America's motion for summary judgment, which is being filed in the matter of <u>Martin Lucas Chioffi, LLP vs. Bank of America, National Association</u>, Case No. 3:08-cv-01388 (MRK), which is currently pending in the U.S. District Court for the District of Connecticut. This case arises out of a safe deposit agreement between plaintiff Martin Lucas Chioffi, LLP ("MLC" or "plaintiff") and Fleet Bank, the predecessor in interest to defendant Bank of America ("BOA" or "the bank" or "defendant") and an unexpected flood that occurred within a BOA banking center in Greenwich, CT on June 8th, 2007.

4. I am currently employed as the Banking Center Manager Vice-President of the BOA banking center located on Greenwich Avenue in Greenwich, CT. In this role I am responsible for the banking center's operations, sale and account activities. I have been employed by Bank of America ("BOA") at this location since the Fall of 2004.

5. In addition, prior to being employed at the BOA banking center located on Greenwich Avenue, I was employed by both Fleet Bank (prior to its merger with BOA) and BOA at other locations in Long Island, White Plains, Stamford and Greenwich.

6. As a result of this experience I have developed personal knowledge of BOA's operations on a local and national level.

7. BOA is a sophisticated banking entity, is one of the nation's oldest banks (dating back to 1784) and is the country's third-largest lender.

8. Headquartered in North Carolina, BOA has a nation-wide network of 5,700 branches and holds assets with an estimated worth of $966 billion. Id.

9. As a result of its merger with Fleet, BOA assumed control of the banking center where I currently work.

10. On or about November 30, 1999, MLC (then known as Martin, Lois Gasparrini) executed a Safe Deposit Box Contract with Fleet Bank.

11. Despite the title of the Contract, it did not involve a traditional "safe deposit box" arrangement as may be commonly understood (i.e., wherein access to a safe deposit box of a given size was granted by Fleet and Fleet provided one set of keys to that box to MLC, with both Fleet and MLC holding keys to the same box).

12. Instead, pursuant to the Contract MLC merely rented floor space in one of Fleet's three (3) basement vaults.

13. MLC moved several of its own metal cabinets into the vault, kept various client property inside the cabinets, and added or removed its' clients' property whenever it saw fit to do so.

14. The cabinets were secured by MLC in several different ways.

15. First, the cabinet drawers had locks built into them, and only MLC had the keys to these drawer locks.

16. In addition, MLC had bars installed across the fronts of the cabinets, which were also secured by locks. Again, only MLC had the keys to these additional locks.

17. Unless MLC provided keys to these locks to Fleet or BOA (which it never did), there was no way that anyone from Fleet could open the cabinet drawers.

18. Consistent with this fact, MLC alone determined who could access the cabinets.

19. Pursuant to a "Safe Deposit Box Certificate of Access and Indemnification" that was periodically submitted to the bank by MLC, MLC identified by name and signature those particular individuals who had MLC's permission to access the MLC cabinets.

20. The Rules limited the contents of the box to only those items that were legal and safe (e.g., explosives were not permitted, nor were nuisance items).

21. Otherwise, MLC alone determined what – if anything – was put into and/or taken out of the cabinets.

22. At no time was MLC ever required to provide Fleet or BOA with an inventory or other description of the items placed within these cabinets, and has never done so.

23. MLC has never been required to provide Fleet or BOA with a description of an item's location within a given cabinet (e.g., whether a particular item was placed in a top drawer or a bottom drawer), and has never done so.

24. The Bank limited customer access to the vault only by virtue of its business hours.

25. Aside from opening the vault doors in the mornings, and locking the vault doors at night, the Bank did not prevent any authorized MLC representative to access the MLC cabinets at any time.

26. Thus, as long as the bank was open for business, MLC alone determined when its client's property was put into or removed from the cabinets, and where within those cabinets the property was placed.

27. On those occasions when MLC would access its cabinets, it would do so alone: although Bank representatives escorted MLC agents to the vault door, they would not go inside with those reps when client property was being accessed but waited outside the vault while MLC conducted its business.

28. MLC did not have exclusive access to the vault into which it placed its cabinets; other law firms had cabinets placed in the same vault.

29. At no point in time - either when the contract was signed or thereafter – was MLC ever a banking customer of Fleet or BOA: it had never held any professional checking, savings or trust accounts with Fleet or BOA.

30. Thus, the only contact MLC representatives had with Fleet or BOA at the Greenwich Avenue location was on those occasions when MLC would access the cabinets in the basement.

31. According to a "Safe Deposit Box Record of Access Card", MLC accessed its cabinets infrequently. For example, MLC accessed its cabinets nine (9) times in the year 2004 (i.e., less than once per month), seven (7) times in the year 2005, five (5) times in the year 2006 and three (3) times in the year 2007.

32. In contrast, the other law firms who rented vault space in the basement visited the vault on a weekly, and sometimes daily basis.

33. These other firms were also regular banking customers of Fleet / BOA.

34. As a general matter, the vault rental space arrangement at issue was originated by Fleet Bank decades before BOA took over Fleet operations.

35. When BOA took over Fleet operations, it inherited the arrangement. Id.

36. BOA has never offered this type of service to its customers, either at the time it took over Fleet operations or at present.

37. Were a customer of BOA or a member of the general public to request such a service, BOA would refuse it.

38. BOA continued to the service only as an accommodation to those customers who had an existing arrangement with Fleet prior to the BOA-Fleet merger.

39. BOA currently charges a nominal annual fee of $150 per cabinet.

40. The vaults are secured by lock and key, by wired alarms, and are also under digital video surveillance monitored by BOA security teams. Additionally, the vaults are monitored on a 24-hour a day/ seven day a week basis by ADT for heat variations and motion detection.

41. After executing the Contract, MLC stored client property in the basement of the Bank for many years without incident.

42. Sometime after the Bank closed on Friday June 8th, 2007 (either during the evening hours of the 8th or the morning hours of Saturday, June 9th), a water pipe in the Bank burst.

43. The pipe failure caused a toilet in the Bank Manager's office to overflow.

44. The office was located directly above the vault containing MLC's cabinets; the overflowing water eventually penetrated the ceiling above the vault, ran down the walls into the

basement and collected on basement floor (including the floor inside the vault where MLC had its cabinets).

45. The flooding water was not detected until the morning of Saturday, June 9th, 2007, when BOA employee Wilfredo Magan went to the basement to open the vaults for the day.

46. Upon entering the basement, Mr. Magan observed water flowing from the furnace room located next to the vault.

47. He inspected the furnace room, and determined that the water was flowing down the furnace room walls.

48. Recalling the bathroom above the furnace room, he immediately went upstairs to inspect the bathroom, and found the toilet overflowing.

49. He immediately turned off the water to the toilet, and then called the BOA emergency clean-up number to have a maintenance crew come and clean up all the water.

50. The maintenance crew came right away and immediately began cleaning up the water.

51. During the course of the clean-up, it was discovered that water had also penetrated one of the vaults.

52. The particular vault was therefore immediately opened and cleaned: the water was vacuumed out, large fans were placed to remove excess moisture, a dehumidifier was placed in the vault and tarps were placed over the cabinets.

53. There had never been a prior incident of a water pipe failing at this banking center.

54. There was no prior indication that the pipe within the walls was about to burst: no water flow interruptions, no toilet problems, no water stains on the walls or floors or ceilings, no dripping walls or leaking ceilings.

55. The water clean-up took place on Saturday, June 9th, 2007, and continued for several days thereafter.

56. On the Monday following the leak, a repair crew was called to the Bank to fix the problem that caused the leak.

57. The repair crew determined that a pipe within the ceiling above the vault area had deteriorated due to age and failed.

58. MLC learned of the flood on September 5th, 2007, when MLC representatives discovered that files stored in one of the bottom drawers of a file cabinet were damp.

59. MLC now claims that a sub-section of the files contained within these cabinets were damaged to the point of needing to be re-executed, and is seeking compensation for the same.

60. As of the date of the June 2007 flood, I was not aware that MLC had stored files in any of the basement vaults. MLC was not a regular banking customer of BOA, did not maintain any kind of checking, savings or trust accounts with BOA, and did not visit the banking center with the kind of frequency that would have led to my being familiar with this particular firm. I have never personally taken anyone from MLC down to the vault area in order to access MLC's cabinets.

61. In contrast, the other law firms that utilized the "vault access" service were regular banking customers of BOA who visited the vault quite frequently: at least weekly and sometimes daily.

62. In fact, one of these customers actually visited the banking center to access the vaults on the day the flood was discovered.

63. For this reason, the other law firms who stored cabinets in the vaults were immediately notified about the flood.

64. In contrast, MLC was not a regular banking customer, and visited the vault on a relatively infrequent basis: the first time MLC visited the banking center to access the cabinets after the flood was three (3) months later, and it was only then that it learned of the flood's occurrence. Coincidentally, this was the first time that I became personally aware that MLC had stored any files in the flooded vault.

65. In addition, the record-keeping system used by BOA pertaining to this particular "vault access" arrangement did not specify the particular vault in which firms stored its cabinets. In other words, the records maintained by BOA did not specify that MLC, for example, kept three (3) cabinets in Vault 1, four (4) cabinets in Vault 2, and two (2) cabinets in Vault 3. Instead, the records merely indicated that cabinets were kept in the vaults, and indentified who was authorized to access those cabinets.

66. Although I inspected the flooded vault within days after the flood occurred, I did not observe any MLC cabinets in the vault itself (although there are numerous file cabinets in this vault, but MLC stored only three (3) within the vault itself).

67. For this reason, too, neither myself nor Mr. Magan were aware that MLC had stored cabinets in the vault that actually flooded until MLC actually visited the vault several months after the flood itself.

68. I am aware that MLC claims that BOA intentionally failed to notify MLC of the flood in a timely fashion, and that BOA intended for MLC's documents to be damaged by the flood at issue.

69. Nothing could be further from the truth. Neither I individually nor BOA as an organization harbors any ill will, malice or other hostile intent toward MLC. To the contrary, any lapse in time between the flood and MLC learning of it is attributable solely to the fact that no one at the BOA banking center was familiar enough with MLC as an entity to notify it immediately that the flood had taken place. In short, BOA did not know enough about MLC to even identify it as a vault customer, let alone to wish MLC harm in any way.

70. I have reviewed the foregoing statements and believe them to be true and accurate, based upon my own information and belief.

/s/ JONATHAN SCHMID

Sworn to before me this 30th day of November, 2009.

Notary Public/Commissioner of the Superior Court