# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARTIN LUCAS & CHIOFFI, LLP, | : | Civil Action No.: 3:08-CV-01388 (MRK) |
| Plaintiff, | : | |
| -against- | : | |
| BANK OF AMERICA , NATIONAL ASSOCIATION, | : | |
| Defendant. | : | November 30, 2009 |

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION
## <u>FOR SUMMARY JUDGMENT</u>

GOLBERG SEGALLA, LLP
*Attorneys For Defendant*
By Brian T. Stapleton, Esq. (CT13418)
100 Pearl Street
Hartford, CT 06103
(860) 241.0063 – tel
(860) 241-0062 – fax
bstapleton@goldbergsegalla.com

## FACTS

The facts supporting the defendant's Motion for Summary Judgment have been fully stated in the Local Rule 56(a)1 Statement that accompanies the motion and this memorandum. Those facts are incorporated by reference as if fully repeated here.  Where appropriate, those facts are specifically cited here.

## SUMMARY JUDGMENT STANDARDS

A party moving for summary judgment under Fed.R.Civ.P. 56(c) has the burden of showing, based upon pleadings, discovery and disclosure materials and affidavits, that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Id.  "The standards governing summary judgment in the Second Circuit are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters v. Simon*, 310 F.3d 280, 285-86 (2d Cir. 2002); *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir. 1994); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255,

91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  In short, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Id. at 255.

## POINT I

**The Exculpatory Clause Contained in the Rules is Valid and Binding and Clearly Imposes Liability on the Bank in Only One Circumstance:  Where the Bank Negligently Allows Unauthorized Access to Plaintiff's Safe Deposit Box.  Since All of the  Plaintiff's Claims Are Based on an Unexpected Flood, and None Involve an Unauthorized Individual Accessing the MLC Cabinets, the Plaintiff's Complaint Must Be Dismissed In Its Entirety.**

The Contract at issue was freely entered into between two sophisticated business entities. The Rules governing the Contract clearly and specifically outline the primary and singular duty of the Bank: to "use ordinary care to prevent  unauthorized persons from gaining access to the Safe Deposit Box."  This Exculpatory Clause plainly and unmistakably limited the liability of the Bank only to those future situations where the Bank failed to exercise due care in restricting access to the Safe Deposit Box.  Each and every one of the plaintiff's claims are predicated on damages flowing from an unexpected and unforeseen flood.  Since these claims do not involve an unauthorized person gaining access to MLC's file cabinets, they fall outside the scope of the Exculpatory Clause.  For this reason, the plaintiff's Complaint should be dismissed in its entirety.

Connecticut law upholds exculpatory clauses where their language is plain, unambiguous and unmistakable and the clauses do not violate public policy concerns.  Where the parties to the contract are sophisticated business entities, an even more relaxed linguistic standard is applied,

with enforceability requiring only that the exculpatory clause evidence the intent of the parties to

the contract.   In *B & D Associates, Inc. v. Russell*, 73 Conn. App. 66 (Oct. 2002),  plaintiff  (a

commercial tenant) brought a negligence action against defendant landlord for losses due to a

fire. The defendant moved for summary judgment, claiming that a provision in the lease released

him from all liability. Id., 68. The lease provided that the tenant bore the risk of loss and would

not hold the landlord liable for any damage or loss that occurred for any reason. Id., 68-69. The

provision was highly detailed and specific, and read as follows:

> *Risk of Loss. It is expressly understood and agreed between the parties hereto that
> all goods, wares, merchandise, equipment, furnishings, tools, machinery and
> every other property of any other nature whatsoever, stored, used, maintained or
> kept on the herein leased premises, will be stored, used, maintained and kept on
> the herein leased premises by said TENANT, TENANT'S agents, servants,
> customers or by any other person or persons whatsoever solely at the risk of
> TENANT and/or any of the aforementioned persons or classes of persons; and
> there shall be no liability on the part of the LANDLORD to said TENANT and/or
> to any of said persons or classes of persons, or to anyone else for any damage or
> loss to any of the foregoing from any cause or for any reason whatsoever.*

Id. at 69.

The trial court granted the defendant's motion and the plaintiff appealed, claiming that the

provision did not release the defendant from liability stemming from his own negligence. Id., 70.

The appellate court affirmed, finding that the provision released the defendant from liability for

any negligence:

> *[t]he law does not favor contract provisions which relieve a person from his own
> negligence. …  Such provisions, however, have been upheld under proper
> circumstances. …  [T]he law's reluctance to enforce exculpatory provisions of
> this nature has resulted in the development of an exacting standard by which
> courts measure their validity. So, it has been repeatedly emphasized that unless
> the intention of the parties is expressed in unmistakable language, an exculpatory
> clause will not be deemed to insulate a party from liability for his own negligent
> acts. … Put another way, it must appear plainly and precisely that the limitation
> of liability extends to negligence or other fault of the party attempting to shed his
> ordinary responsibility. …  Not only does this stringent standard require that the*

> *drafter of such an agreement make its terms unambiguous, but it mandates that the terms be understandable as well. Thus, a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon. … Of course, this does not imply that only simple or monosyllabic language can be used in such clauses. Rather, what the law demands is that such provisions be clear and coherent . … By and large, if such is the intention of the parties, the fairest course is to provide explicitly that claims based on negligence are included. … That does not mean that the word 'negligence' must be employed for courts to give effect to an exculpatory agreement; however, words conveying a similar import must appear. … When applied to contracts to which the parties are sophisticated business entities, the law, reflecting the economic realities, will recognize an agreement to relieve one party from the consequences of his negligence on the strength of a broadly worded clause framed in less precise language than would normally be required, though even then it must evince the unmistakable intent of the parties . . . .'*

Id., 72-73, [quoting *Gross v. Sweet*, 49 N.Y.2d 102, 107-108, 400 N.E.2d 306, 424 N.Y.S.2d 365 (1979)].

Applying these principles to the release, the *B&D* court held that the language of the Release was clear and unambiguous and did not require examination beyond the text to discern the intent of the parties. Id. at 73. Since the language itself unmistakably evidenced an intent to release the defendant from liability for the plaintiff for the losses listed therein, no matter how incurred, the dismissal of the complaint was affirmed. Id.

The Connecticut Supreme Court revisited this issue in *Hyson v. White Water Mountain Resorts of Connecticut Inc.*, 265 Conn. 636 (Sept. 2003). The plaintiff in *Hyson* was injured while snowtubing and filed a complaint against the defendant alleging that the defendant's negligence proximately had caused her injuries. Id., 637-39. Specifically, the plaintiff claimed that the defendants failed to maintain a barrier at the bottom of a tubing hill, failed to safely stop tubes at the bottom of that hill, and failed to warn patrons that the bottom of the hill ended in a cliff, below which was rocky and hard ground. Id. at 639.

Prior to snowtubing, the plaintiff had signed an exculpatory agreement entitled "RELEASE FROM LIABILITY." Id., 637, 638 n.3. The language of the Release focused exclusively on the dangers involved with snowtubing, and failed to mention – in any way – any negligence attributable to the defendant facility:

> *SNOWTUBING. RELEASE FROM LIABILITY. PLEASE READ CAREFULLY BEFORE SIGNING. 1. I accept use of a snowtube and accept full responsibility for the care of the snowtube while in my possession. 2. I understand that there are inherent and other risks involved in SNOWTUBING, including the use of lifts and snowtube, and it is a dangerous activity/sport. These risks include, but are not limited to, variations in snow, steepness and terrain, ice and icy conditions, moguls, rocks, trees, and other forms of forest growth or debris (above or below the surface), bare spots, lift terminals, cables, utility lines, snowmaking equipment and component parts, and other forms [of] natural or man made obstacles on and/or off chutes, as well as collisions with equipment, obstacles or other snowtubes. Snow chute conditions vary constantly because of weather changes and snowtubing use. Be aware that snowmaking and snow grooming may be in progress at any time. These are some of the risks of SNOWTUBING. All of the inherent risks of SNOWTUBING present the risk of serious and/or fatal injury. 3. I agree to hold harmless and indemnify Powder Ridge, White Water Mountain Resorts of Connecticut, Inc. and/or any employee of the afore mentioned for loss or damage, including any loss or injuries that result from damages related to the use of a snowtube or lift. I, the undersigned, have read and understand the above release of liability.*

Id. at 639.

Plaintiff in *Hyson* claimed that this Release language did not release the defendant from its own negligence, because the defendant's own negligence was not expressly mentioned in the Release itself. Id. at 641. Plaintiff also made the argument that the Release itself violated public policy, but the Court didn't reach this issue as it agreed with the plaintiff's first point:

> *a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides. The release signed in the present case illustrates the need for such a rule. A person of ordinary intelligence reasonably could believe that, by signing this release, he or she was releasing the defendant only from liability for damages caused by*

> *dangers inherent in the activity of snowtubing.  A requirement of express*
> *language releasing the defendant from liability for its negligence prevents*
> *individuals from inadvertently relinquishing valuable legal rights.   Because the*
> *release signed by the plaintiff  did not expressly provide that, by signing it, she*
> *released the defendant from liability for damages resulting from its negligence,*
> *the trial court improperly granted the defendant's motion for summary judgment.*

Id., 643-44. n7

The  *Hyson* Court,  acknowledging the Appellate court's decision in *B & D Associates, Inc.*, declined to consider specific language requirements for the effective release of liability in commercial leases. See *Hyson v. White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 640 n.6.

In *Hanks v. Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326, 885 A.2d 734 (Nov. 2005) (en banc) the Connecticut Supreme Court decided the issue it explicitly left unresolved in *Hyson,* namely "whether the enforcement of a well-drafted exculpatory agreement purporting to release a snowtube operator from prospective liability for personal injuries sustained as a result of the operator's negligent conduct violates public policy." *Hanks v. Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326, 885 A.2d 734 (Nov. 2005) (en banc).

In  resolving this issue, the Court first found that the language of the Release plainly and properly excluded the defendant from liability for its own future negligence, and that (unlike in *Hyson*), any ordinary person of able intelligence would understand that by signing the Release he was absolving the facility from its own negligence.  Id. at 325.

Turing to the public policy question, the *Hanks* court examined six (6) factors identified by the California Supreme Court in *Tunkl v. Regents of the University of California*, 60 Cal.2d 92, 101, 383 P.2d 441 (1963) to determine whether exculpatory agreements adversely effect the public interest:  (1) the agreement concerns a business of a type generally thought suitable for

public regulation; (2) the party seeking exculpation is engaged in per forming a service of great importance to the public, which is often a matter of practical necessity for some members of the public; (3) the party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards; (4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services; (5) in exercising a  superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; and (6) as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." Id., 276 Conn. 314 at 328.

The *Hanks* court noted that "no definition of the concept of public interest can be contained within the four corners of a formula," (Id. at 330), but nonetheless concluded that the "ultimate determination of what constitutes the public interest must be made against the totality of the circumstances of any given case against backdrop of current societal expectations."  Id.

Applying the *Tunkl* factors, the *Hanks* court found that the language of the Powder Ridge release adversely affected a public interest in utilizing a safely maintained and operated recreational sporting facility that was open to any member of the general populace who wished to use it.  Id. at 330-331.

In addition to the highly important "public participation" aspect, the Court concluded that the release violated public policy because: (1) the defendants invited the public generally to snowtube at their facility, regardless of snowtubing ability; (2) snowtubers are under the

exclusive physical care and control of the defendants as a result of an economic transaction; (3) the defendants, not recreational snowtubers, have the knowledge, experience and authority to maintain the snowtubing runs in reasonably safe condition, to determine whether the snowtubing equipment is adequate and reasonably safe, and to guard against the negligence of its employees and agents; (4) the defendants are in a better position to insure against the risk of their negligence and to spread the costs of insurance to their patrons; (5) if the release were to be upheld under the particular facts of this case, the defendants would be permitted to obtain broad waivers of their liability and the incentive for them to maintain a reasonably safe snowtubing environment would be removed, with the public bearing the cost; (6) the agreement at issue is a standardized adhesion contract, offered to snowtubers on a "take it or leave it" basis, and without the opportunity to purchase protection against negligence at an additional, reasonable fee; and (7) the defendants had superior bargaining authority. Id., 276 Conn. 314, 333.  On this basis, the Court remanded the matter for further proceedings.

The Appellate Court again examined the enforceability of an exculpatory clause in *Roman v. City of Bristol*, 2007 Conn. App. LEXIS 236, 10-12 (June 2007).  In that case, defendant-third party plaintiff City of Bristol leased a training center to third-party defendant Community Renewal Team.  The lease contained a hold harmless and indemnity clause favoring the City.  A Community Renewal Team employee was "free-falling" using a rope attached to an elevated platform and was seriously injured.  She later sued the City, claiming that one of the facility's instructors (a City employee) negligently failed to catch her as she fell.  The City later impleaded Community Renewal Team, seeking indemnity and hold harmless protection. Community Renewal Team moved for summary judgment on the grounds that the indemnity

provision in the lease did not specify that Community Renewal would be liable for the City's own negligence. The trial court granted summary judgment and the City appealed.

The Appellate Court reversed, declining to determine whether the agreement *expressly* stated that the third party plaintiffs would be held harmless for their own acts of negligence, since it found that a genuine issues of material fact existed concerning the relative bargaining power of the parties and whether they were "sophisticated business entities" (in which case such explicit language could be unnecessary). However, in remanding the case the appellate court took note of the trial court's reasoning:

> We decline to determine whether the agreement expressly stated that the third party plaintiffs would be held harmless for their own acts of negligence because we conclude that there exists a genuine issue of material fact regarding whether the parties are "sophisticated business entities," in which case such explicit language could be unnecessary. See B & D Associates, Inc. v. Russell, supra, 73 Conn. App. 73. The court found that the third party defendant "may be more akin to a sophisticated business entity than an individual," but attempted to distinguish B & D Associates, Inc., by stating that "the agreement shares none of the characteristics of a commercial lease that is freely negotiated between two business entities for an extended period of time." We are not unmindful that the agreement in B & D Associates, Inc., involved a commercial lease that likely was negotiated over an extended period of time; nevertheless, nothing in the case indicates that either of these factors is a prerequisite for a valid hold harmless agreement. On the contrary, B & D Associates, Inc., contains broad language that applies merely to "sophisticated business entities."

These cases offer examples of the validity or invalidity of exculpatory agreements. In *B & D Associates, Inc.*, and *Roman*, the Appellate Court held that less precise language is required when one contracting party among "sophisticated business entities" seeks to relieve itself of its own negligence, implicitly concluding that such an exculpatory clause could be valid. In *Hyson* and *Hanks*, the Supreme Court concluded that in a recreational setting in which there is a distinct inequity in bargaining power between the parties, imprecise hold harmless language is fatal to the legal merit of the agreement, despite the parties' intent.

GOLDBERG SEGALLA LLP
100 Pearl Street, 7th Floor
Hartford, CT 06103-4506

Application of these principles makes clear that the case against BOA must be dismissed in its entirety.

Turning first to the language of the Exculpatory Clause within the Rules, it plainly and unmistakably imposes liability on the Bank in only one situation: where the Bank negligently permits an unauthorized individual to access the MLC cabinets.  The language of the clause is clear and unambiguous, and does not require resort to a magnifying glass or lexicon to be understood. Thus, any ordinary person of able intelligence would understand that by signing the Contract, he was releasing the Bank from liability under all circumstances except those wherein the Bank negligently permitted an improper person access to a MLC client's property. Since the damages claimed by the plaintiff are predicated on an unforeseeable incident of flooding, they fall beyond the scope of the exculpatory clause and the Bank is not liable for them.

The propriety of the exculpatory clause is strengthened when the Court considers that the contract was entered into by two sophisticated business entities: one being a large bank and the other a law firm with "extensive business experience" that specializes in all aspects of business law.  The clause's enforceability is an even more compelling conclusion when one considers that Christopher Martin, the attorney and CPA who signed the Contract on behalf of MLC,  had decades of legal experience focusing on intricate and complex business matters.

Turning next to the issue of public policy, it is clear that the language of the Exculpatory Clause do not violate any public interest or policy.  There can be no doubt that banking, as a general matter, is a business suitable for public regulation and of great public importance.  The public interest in banking is clear: citizens need institutions which can protect their day-to-day finances and long-term savings against theft or fraud.  Society expects that banks will be secure against theft, and that banks will honor their fiduciary responsibilities wisely and honestly.  In

the context of safe deposit boxes, society's clear expectation is that banks will take reasonable steps to ensure that the valuables stored in such boxes will not be stolen.

In these regards, the Contract's Exculpatory Clause preserves and furthers the public interest by imposing liability on the Bank if it negligently allows any unauthorized person into its vaults.   If the Bank were permitted to exonerate itself for negligently permitting a security breach in its vaults, the public's fundamental interest in safe deposit boxes would be undermined. The Exculpatory Clause in this case incentivizes the Bank to provide a secure safe deposit box environment by imposing liability for security failures, and therefore keeps the public interest in banking inviolate. For these reasons, the clause satisfies the first and second *Tunkl* factors.

It is questionable, however, if the second *Tunkl* factor even applies to this case.  The facts at bar show that the arrangement between the Bank and MLC did not involve a traditional safe deposit box, but was in reality more akin to an aggrandized self-storage deal.  Given the prevalence of alternative secure off-site storage facilities available to MLC (not just those offered by other banks, but those offered by non-bank secure facilities like U-Haul or Westy's) it cannot be fairly said that the accommodation inherited by BOA was a matter of "practical necessity" to MLC: MLC could just as easily have used any number of other safe and secure off-site storage facilities besides the one offered by the Bank at the time.

The third *Tunkl* factor clearly favors the Bank, since – at the time of the loss suffered by MLC - BOA was not offering the "vault access" service used by MLC to either the general public or its own banking customers. In fact, BOA has *never* offered this service to anyone on its own, does not do so today, and only continues the service as an accommodation to those inherited Fleet customers that used the service prior to BOA's merger with Fleet.  It therefore cannot be said that the clause implicates *any* public concern, since Fleet's "vault access" service

was not being offered to *any* part of the general public at the time or loss, and is not being offered to anyone in the present. [emphasis added].

For this same reason, the fourth *Tunkl* factor clearly favors the Bank: the Bank's "vault access" service is non-essential, fundamentally private and was discontinued at the time of MLC's loss.  In addition, the nominal access fee of $150 per year reinforces that this service was offered almost as a gratuity by Fleet, and betrays any serious consideration that the Bank somehow gained a "decisive advantage of bargaining strength" against MLC when the contact was executed.

The fifth *Tunkl* factor also warrants dismissal, since the Contract never precluded the option of MLC paying additional fees to obtain protection against the Bank's negligence. Quite to the contrary, the contract explicitly advised (and implicitly encouraged) MLC to obtain its own insurance in the event the contents of the cabinets were lost or damaged.  Not only did MLC actually procure such insurance, but it submitted a claim for damage to its client files and received reimbursement in the amount of Twenty Five Thousand Dollars ($25,000).

The sixth *Tunkl* factor warrants dismissal, since  MLC's property was never placed under the exclusive control of the Bank and therefore subject to the Bank's negligence or recklessness. The fact of this case are not even remotely related to those of *Hanks* and *Hyson*.  In *Hanks* and *Hyson*, snowtubers were forced to use equipment provided by the Mountain operator.  Once launched down a tubing chute created and maintained by the operator, the tubers were completely at the mercy of the mountain, for better or worse, and wholly reliant upon Mountain operators to safely stop their descent.  In contrast, MLC utilized cabinets of its own choosing and exercised complete and private control over who could access those cabinets, what was put into or taken out of them, where the property was placed inside the cabinets, and when the property

could be removed.  MLC was free to terminate the arrangement at any time prior to the loss. Even continuing the arrangement, MLC had the option of removing most – or even all – of the client property within the cabinets, but leaving the cabinets themselves for future use.  Since MLC exercised far more control over these cabinets than the Bank's representatives did, the sixth *Tunkl* factor completely favors the Bank.

An additional factor considered by the *Hanks* court warrants discussion here.  In *Hanks*, the Court expressly held that Mountain operators had greater knowledge, experience and authority to maintain the tubing runs in a reasonably safe condition and to determine if the tubing equipment was safe.  The same cannot be said here.  From an anti-theft perspective, the Bank certainly occupies a superior position when it comes to determining the safety of the vaults – or even the safety of the cabinets.  However, in the absence of tell-tale signs of impending pipe failure, the Bank is no better position to determine the adequacy of its hidden plumbing than a plumber would be if asked to break into a six-inch thick vault door.  Put another way, it is absurd to argue that a banker has any greater level of plumbing expertise than does a banker's customer (unless, of course, that client happens to be a plumber).

Since the language of the exculpatory clause is clear, unambiguous and does not violate public policy, all of the claims against BOA should be dismissed in their entirety.

## POINT II

### Plaintiff's Negligence Claim Must Fail Since MLC Cannot Establish the Requisite Elements of Prior Notice or Proximate Cause.

Whether viewed through a prism of general negligence principles or (more appropriately) according to the negligence standards applicable to landowner-licensee relationships, the plaintiff cannot establish the crucial elements of his negligence claim:  notice and proximate cause.  For this reason, the plaintiff's negligence claim must be dismissed.

### General Negligence Principles

The essential elements of a cause of action in negligence are well established:  duty; breach of that duty; causation; and actual injury.  *Archambault v. Soneco/Northeastern, Inc.,* 287 Conn. 20, 33 (Conn. 2008); *Mazurek v. Great American Ins. Co.*, 284 Conn. 16, 29, 930 A.2d 682 (2007). With respect to the element of causation, a plaintiff must establish that the defendant's conduct legally caused the injuries, that is, that the conduct both caused the injury in fact and proximately caused the injury. Id.

Duty is a legal conclusion about relationships between individuals, made after the fact, and is imperative to a negligence cause of action.  *Mazurek v. Great Am. Ins. Co.*, 284 Conn. 16, 30 (Conn. 2007).   Thus, there can be no actionable negligence unless there exists a cognizable duty of care. Id.  The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand.  *RK Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994).

There can be no breach of duty by a defendant unless the defendant knew of a danger / defect or was chargeable with notice of it.   The Connecticut Supreme Court has repeatedly

stated that the notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. *Cruz v. Drezek*, 175 Conn. 230, 235-236 (1978), citing *White v. E & F Construction Co.*, 151 Conn. 110, 114, 193 A.2d 716 (1963); *New Britain Trust Co. v. New York, N.H. & H. R. Co.*, 145 Conn. 390, 393, 143 A.2d 438 (1958); *Drible v. Village Improvement Co.*, 123 Conn. 20, 23, 192 A. 308 (1937); *Monahan v. Montgomery*, 153 Conn. 386, 390, 216 A.2d 824 (1966).   On the question of notice, the trier's consideration must be confined to the defendants' knowledge of the specific condition causing the injury, and such knowledge cannot be found to exist from a knowledge of the general or overall conditions obtaining on the premises.  *Monahan  v. Montgomery*, supra.

The test for "cause in fact" is whether the injury have occurred were it not for the actor's conduct.  The test of proximate cause is whether the  defendant's  conduct is a substantial factor in producing the plaintiff's injury. The "substantial factor" test asks whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence.  *Craig v. Driscoll*, 262 Conn. 312, 330-31, 813 A.2d 1003 (2003).  "The question  of proximate causation generally belongs to the trier of fact because causation is essentially a factual issue." *Label Systems Corp. v. Aghamohammadi*, 270 Conn. 291, 321, 852 A.2d 703 (2004).

To be certain, BOA has shown that the only duty imposed by the Contract was to guard against unauthorized access, and it fully discharged that duty in this case:  the BOA vaults are secured by lock and key, by wired alarms, and are also under digital video surveillance monitored by BOA security teams.  Additionally, the vaults are monitored on a 24-hour a day/ seven day a week basis by ADT for heat variations and motion

detection.  Exhibit B at p.5, ¶ 40.  Even more, BOA required MLC to submit access cards to the Bank so that it could properly identify only those persons that MLC wished to have access to its cabinets at BOA.  These steps are not only reasonable precautions to safeguard against the theft of the client property within the cabinets, they actually worked:  in the ten-plus years since MLC has been storing property in the BOA vault, there hasn't been one complaint of unauthorized access or theft.  Since BOA has completely discharged the sole duty imposed by the Contract, it cannot be said to have caused MLC any harm.

Looking past questions of contact interpretation, and focusing on the general negligence requirement of prior notice, MLC's claim must still fail.  It is beyond question that there had been no prior water leaks at the BOA banking center in  Greenwich.  MLC admitted that is has no "prior notice" evidence: Mark Chioffi testified under oath that he was unaware of any prior incidents of water intrusion or flooding at the BOA banking center, and that he "didn't know" if BOA had any prior notice of any flooding problems that preceded the June 2007 incident. Exhibit D, pp.76, 117.

According to Jonathan Schmid and Wilfredo Magan, there were no pre-flood indicators that a water intrusion was about to happen: no water flow interruptions, no toilet problems, no water stains on the walls or floors or ceilings, no dripping walls or leaking ceilings. Exhibit B at p.6, ¶ 54; Exhibit G at p.3, ¶ 20.  In sum – and by plaintiff's own admission – the flood of June 8th, 2007 was completely unexpected and totally unforeseeable.

In the absence of actual or constructive notice, the flood cannot be said to have been so foreseeable as to impose a duty upon BOA to prevent it.  In the absence of duty there can be no breach, and for this reason plaintiff's negligence claim must be dismissed.

Plaintiff's negligence theory also fails the tests of legal causation. Mr. Chioffi testified the delay in time between the flood on June 8th, 2007 and MLC's discovery of it three (3) months later destroyed MLC's chances of saving the client signatures salvaged, thereby necessitating that the  documents be re-executed.  Exhibit D, pp.144-147.  Put more succinctly, the plaintiff's causation theory is that the delay caused by BOA not promptly advising MLC of the flood was the reason the signatures couldn't be saved.

Under the plaintiff's own theory, then, MLC must show that signatures existed in a salvageable state for some period of time after the flood, but that this "salvageable window of opportunity" closed due the BOA's not notifying MLC until three months later.  Put another way, the plaintiff must prove that the signatures *weren't immediately destroyed* in the hours before Wilfredo Magan first discovered the flood after opening the banking center for business (*i.e.,* before anyone could take reasonable steps to prevent further water damage to the documents). [emphasis added].

The claim thusly framed, under the "cause in fact" test plaintiff must prove that the only reason the signatures could not be recovered was due to the lapse in time between the flood and MLC's discovery of it.  Under the "proximate cause" test, plaintiff must show that the lapse in time was a substantial factor in bringing about the signature's damage.

These showings implicate issues of the water solubility of ink and the nature of the paper it was printed on.  These are complicated issues, beyond the realm of a juror's ordinary experience and understanding.  As such, they require expert testimony to be resolved.  See, e.g., *Namoury v. Tibbetts*, 2008 U.S. Dist. LEXIS 85541 (D. Conn. 2008).  Mr. Chioffi has no direct, first-hand proof as to whether the documents were damaged immediately after the flood or sometime thereafter, since he did not even discover the flood until three (3) months after the fact.

Mr. Chioffi has admitted that he is no expert on the subject of signature recovery (Exhibit D, p.144, lines 9-13), and has not consulted with any experts about the issue.  Exhibit D, pp.144-147.  While Mr. Chioffi may have confidence in his own personal opinions on the issue of causation, he is not competent to testify about them in a court of law, and MLC has not disclosed any experts who will do the same.  As a practical matter,  then, the plaintiff has no legally sufficient proof to satisfy the element of causation.  Issues of expertise aside, Mr. Chioffi himself admitted that he has no proof that the delay in notification of the flood made any difference in terms of salvaging the signatures.  Exhibit D, p.p. 146-147.  Thus, under any factual scenario, plaintiffs simply cannot satisfy the requisite showing of cause-in-fact.

Plaintiff likewise cannot prove legal causation.  Given the absence of foreseeability, the plaintiff cannot credibly claim that any conduct by BOA created a risk that MLC's client documents would be damaged.  BOA's conduct was therefore not a substantial factor in causing this water damage.

Since plaintiff cannot satisfy any element of legal causation, the plaintiff's general negligence theory cannot survive.

While Mr. Chioffi insists that BOA ought to have taken steps to inspect the plumbing inside the walls so as to prevent the flood (Exhibit D, pp.115-118), the law imposes no such obligation on BOA as a landowner in relationship to a licensee.

**Negligence Principles in a Landowner-Licensee Relationship**

In general, Connecticut recognizes an ascending degree of duty owed by the possessor of land to persons on the land based on their status as either trespassers, licensees or invitees. *Morin v. Bell Court Condominium Ass'n*, 223 Conn. 323, 327-328 (Conn. 1992); *Corcoran v. Jacovino*, 161 Conn. 462, 465, 290 A.2d 225 (1971).

A licensee is a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission. *Salaman v. Waterbury*, 246 Conn. 298, 305, 717 A.2d, 161 (1998). An invitee is one who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with the business dealings between them. *Hoadley v. University of Hartford*, 176 Conn. 669, 673, 410 A.2d 472 (1979). See also, *Booty v. Stoll*, 2006 Conn. Super. LEXIS 2037 (Conn. Super. Ct. July 6, 2006).

The Contract references the creation of a landlord-tenant relationship between BOA and MLC.  In truth, however, this characterization is inaccurate: MLC was not a "tenant" of property owned by BOA in any sense, since the BOA never transferred any interest in, estate in, or temporary but excusive possession  of  its vault space to MLC at any time.  See, e.g., *Bobryk v. Lincoln Amusements*, 1996 Conn. Super. LEXIS 49 (Conn. Super. Ct. Jan. 5, 1996). E.g., MLC did not rent out BOA's vault space so that its employees could live in it (as one would rent an apartment) or operate its law practice in the vault on a day-to-day basis (as one would rent office space or a storefront).  In reality, BOA granted MLC a  non-exclusive right to enter the vault at times of MLC's own choosing so that MLC could further its own business interests. Importantly, MLC's business interests were exclusive of BOA's:  MLC was not a customer of the bank, and MLC was not a client of the law firm.  MLC's presence within the vault was not in furtherance, or even related to, any business dealings between BOA and MLC since, in point of fact, there were none.  Under these circumstances, then, the vault access granted to MLC by BOA is most accurately characterized as a license to enter BOA's premises.   The court should therefore examine any duty owed by the defendant within that framework.

The duty that a possessor of land owes to a licensee does not ordinarily encompass the responsibility to keep the property in a reasonably safe condition, because the licensee must take the premises as he finds them. *Dougherty v. Graham*, 161 Conn. 248, 251, 287 A.2d 382 (1971). In general, however, with respect to active operations that the occupier engages in (as opposed to passive conditions on the land), there is an obligation to exercise reasonable care for the protection of a licensee.  A possessor must run active operations with due regard for the possibility that a licensee may be present.  The obligation is higher than that owed to a trespasser, because the possessor may be required to look out for licensees before their presence is discovered.  Obviously, what amounts to "reasonable care"  will be affected by factors such as the probability that the licensee will come, whether the licensee may be expected to follow a particular path, the time of day, and the nature of the danger. W. Prosser &  W. Keeton, Torts (5th Ed.) § 60, p. 416.

To be certain, BOA maintained the entire banking center in a state that was not just safe and responsible, but was utterly admirable. Given the  unexpected nature of the flood, BOA is no more liable for its occurrence that it would be if the vault were struck by lightning.   Thus, even if the Court were to consider MLC an invitee as opposed to a licensee, the plaintiff's claim against BOA would still fail.  However, since BOA, as a licensee, was obligated to take the condition of the vault as it found it, it cannot be said that BOA breached any duty owed beyond that stated in the Contract.

For all of these reasons, the plaintiff's negligence claim must be dismissed.

### POINT III

**No Bailment Was Created in This Case Because MLC Exercised Almost**

**Total Control Over the Cabinets, and Exclusive Control Over the Cabinets**

**Contents.  Even if the Court Finds that a Bailment Was Created, BOA has Adequately Explained the Circumstances of the Loss, Thusly Requiring Plaintiff to Prove Negligence.  Since the Elements of Negligence Have Already Been Shown to Be Lacking, The Plaintiff's Bailment Claim Must Fail.**

A bailment arises when the owner of personal property delivers that property to another for some particular purpose, upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the owner's directions.  B. A. Ballou & Co. v. Citytrust, 218 Conn. 749, 753 (Conn. 1991); *Seedman v. Jaffer*, 104 Conn. 222, 226, 132 A. 414 (1926).  In a bailment, the owner (or bailor) retains title to the bailed goods, while the recipient of the goods (or bailee) has mere possession of them. *McKesson & Robbins, Inc. v. Walsh*, 132 Conn. 158, 162, 42 A.2d 841 (1945); *Sturm v. Boker, 150 U.S. 312, 330, 14 S. Ct. 99, 37 L. Ed. 1093 (1893)*.  A bailment is a consensual relation and it includes, in its broadest sense, any delivery of personal property in trust for a lawful purpose. *Pinto v. Bridgeport Mack Trucks, Inc.*, 38 Conn. Sup. 639, 641, 458 A.2d 696 (1983); *Zeterstrom v. Thomas*, 92 Conn. 702, 704, 104 A. 237 (1918).

The essential elements of a bailment are: (1) delivery of personal property by the bailor; and (2) the express or implied assumption of exclusive control over that property by the bailee. *Lissie v. Southern New England Telephone Co.*, 33 Conn. Sup. 540, 543, 359 A.2d 187 (1976). *See also* Malone v. Santora, 135 Conn. 286, 289, 64 A.2d 51 (1949); *On Site Energy Corporation v. Sperry Rand Corporation*, 5 Conn. App. 326, 331, 498 A.2d 121, *cert. denied*, 197 Conn. 818, 501 A.2d 388 (1985); *Desmond v. Wall*, 39 Conn. Sup. 503, 504, 466 A.2d  804 (1983).

A bailment may not exist when the goods entrusted to a party properly are intermingled or commingled with goods belonging to others. *B. A. Ballou & Co. v. Citytrust*, 218 Conn. 749, 753-756 (Conn. 1991) (bailment cannot exist when property is properly commingled or combined with property owned by others).  *Cf.* 2 Restatement (Second), *Agency* § 398, comment (c) (1958) (when there is commingling of funds, auctioneer-seller relationship should be viewed as that of debtor and creditor).

**The Key Element to Creation of A Bailment is Exclusive Control Over the Bailed Property**

Where an alleged bailor does not exercise exclusive control over the bailed property, no bailment is created.

In *Mac-aire Aviation Corp. v. Corporate Air, Inc*., 6 Conn. Cir. Ct. 238 (Conn. Cir. Ct. 1970), plaintiff entered into a contract with the State as the prime fixed base operator at the State's airport. The defendant owned planes and acquired hangar space from the plaintiff by paying a monthly fee. The plaintiff served a notice to quit on the defendant and instituted summary process actions. The defendant resisted, arguing that the relationship was a bailment. The trial disagreed, finding the relationship to be that of lessor and lessee, and found in favor of the plaintiff.  The Court's rejection of the bailment theory focused on the element of exclusive control:

> *An essential element of bailment is control. The finding contains no facts tending to show that the existing arrangement was a bailment. On the contrary, there was a total retention of control by the defendant. … These employees did not do any maintenance work on the defendant's aircraft. The work was done by the defendant's own employees. The defendant, as found by the court, had possession and control of its aircraft within the hangar and moved them in and out of the plaintiffs' hangar at its own pleasure. By analogy, the airplane hangar use, an important issue in this case, is comparable to the automobile parking lot or garage situation.*

Another fact supporting the Court's conclusion that a lease existed was that the defendant put other airplanes in the rented space, and it alone designated which airplanes would be placed there. Thus, the court could reasonably find that even the defendant considered its contract to be a lease rather than bailment of two airplanes.

In *Bobryk v. Lincoln Amusements*, 1996 Conn. Super. LEXIS 49 (Conn. Super. Ct. Jan. 5, 1996), plaintiffs (a minor and her mother and next friend) sought to recover under the Connecticut Products Liability Act (CPLA) for losses suffered after the minor's violent fall from a "Flying Chair" carnival ride owned and operated by defendant. The corporation filed a motion to strike the first two counts of plaintiffs' amended complaint, arguing that plaintiffs' product liability claims failed to allege facts which might establish harm by the corporation's product.

The court granted the motion,  holding that while the CPLA definition of  "sellers" including lessors and bailors, the sale of a ticket to ride was not a lease or bailment of the ride's apparatus.  Instead, the minor acquired a license to ride on the Flying Chairs as a passenger:

> *A lease is a contract under which the lessor, for a fee or other valuable consideration, transfers an interest or estate in real or personal property to the lessee for a stated period of time, with a reversion in the owner after the expiration of the lease.* [cite omitted].  *A lease is distinguishable from a license. While the former confers a right, during the term of the lease, to exercise exclusive possession of and control over the property in question, assertable even against the lessor,* [cite omitted]*, the latter extends but a "privilege to enter or remain upon land by virtue of the possessor's consent, whether given by invitation or permission."* [cite omitted].  *A licensor, unlike a lessor, remains in possession and control of his property for the duration of the license. In this case it is apparent that the plaintiff-minor acquired no more than a license to ride on the Flying Chairs, for at all times relevant to the plaintiffs' claims, the defendant both owned and operated the physical apparatus on which the ride was to be taken. Since the plaintiff-minor, by purchasing her ticket to ride, acquired no estate or interest in the Flying Chairs itself, she cannot be found  to have leased the Flying Chairs for the duration of her ride. For that reason, the Flying Chairs cannot be found to have been a product, within the meaning of the CPLA, on the theory that it was leased to the plaintiff-minor. Appropriately, the plaintiffs make no claim to*

*the contrary in their opposition to the defendant's Motion to Strike.*

The Court also rejected the plaintiffs' bailment theory, finding that the corporation never bailed the apparatus to her because it never relinquished control of the ride to her:

> *The final theory [advanced by plaintiffs] is that by paying for her ride on the Flying Chairs, [plaintiff] became the bailee of the physical apparatus of the Flying Chairs for the duration of her ride. For the following reasons, however, this theory also is without merit … the plaintiffs' own allegations make it clear that the defendant never bailed the Flying Chairs to the plaintiff-minor since it never relinquished control of them to her at any time. To the contrary … plaintiffs expressly allege that "at all times mentioned herein," "the defendant was the owner and operator of the . . . Flying Chairs." Because this allegation completely undermines any claim that Ms. Bobryk became the bailee of the Flying Chairs for the duration of her ride, it likewise defeats any claim that the Flying Chairs were the product of the defendant when they allegedly caused her violent fall.*

Applying these principles to the facts of this case, it is clear that no bailment was created, since MLC never relinquished exclusive control over the cabinets or their contents to BOA.  The cabinets were completely secured by MLC with several different locks and only MLC held the keys.   Exhibit B at p.3, ¶ 15; Exhibit D at 70-74. Unless MLC provided keys to these locks to Fleet or BOA (which it never did), there was no way that anyone from Fleet could open the cabinet drawers. Exhibit B at p.3. ¶ 17; Exhibit D at 74-76.  MLC alone determined who could access the cabinets. Exhibit B at p.3, ¶ 18; Exhibit D at 74-76, 77-79. At no time was MLC ever required to provide Fleet or BOA with an inventory or other description of the items placed within these cabinets, and has never done so.  Exhibit B at p.3, ¶ 22; Exhibit D at 81-84.

MLC has never been required to provide Fleet or BOA with a description of an item's location within a given cabinet (e.g., whether a particular item was placed in a top drawer or a bottom drawer), and has never done so. Exhibit B at p.3, ¶ 23; Exhibit D at 81-84. In comparison, the Bank exercised very little control over the cabinets:  BOA ank limited customer access to the vault only by virtue of its business hours. Exhibit B at p.3, ¶ 24. Aside from opening the vault

doors in the mornings, and locking the vault doors at night, the Bank did not prevent any authorized MLC representative to access the MLC cabinets at any time. <u>Exhibit B</u> at p.3, ¶ 25. Thus, as long as the bank was open for business, MLC alone determined when its client's property was put into or removed from the cabinets, and where within those cabinets the property was placed. <u>Exhibit B</u> at p.4, ¶ 26; <u>Exhibit D</u> at 81-84.

On those occasions when MLC would access its cabinets, it would do so alone: although Bank representatives escorted MLC agents to the vault door, they would not go inside with those reps when client property was being accessed but waited outside the vault while MLC conducted its business. <u>Exhibit B</u> at p. 4, ¶ 27; <u>Exhibit D</u> at 81-84.

Given this glaring absence of control, it cannot be said that a bailment was created, and the plaintiff's bailment claim must be dismissed.

Even if the Court were to find a bailment under these facts, the bailment theory must still fail, since BOA has proffered adequate proof of the circumstances of the loss. Since those circumstances defeat any claim of negligence by MLC, the Bailment theory must be dismissed.

Once a bailment has been established and the bailee is unable to redeliver the bailed goods in an undamaged condition, a presumption arises that the damage or loss was due the bailee's negligence. *H.J. Kelly & Assocs. v. City of Meriden*, 2008 Conn. Super. LEXIS 512, 21-22 (Conn. Super. Ct. Jan. 17, 2008); *National Broadcasting Co. v. Rose*, 153 Conn. 219, 225, 215 A.2d 123 (1965). The presumption continues until the bailee proves the actual circumstances involved in the property's loss, and what, if any, human conduct materially contributed to that immediate cause. <u>Id</u>.; *Mason v. Hartford Hoffman Ford, Inc*., 1994 Conn. Super. LEXIS 2090 (Conn. Super. Ct. Aug. 16, 1994).

The presumption of negligence in bailment cases is merely a procedural device that shifts the burden of first producing evidence about negligence.  *Mason v. Hartford Hoffman Ford, Inc.*, 1994 Conn. Super. LEXIS 2090 (Conn. Super. Ct. Aug. 16, 1994).  The burden in a bailment context is no more onerous than in other negligence claims.  "Since as discussed the presumption is a burden of first producing evidence type it should not take a great deal of evidence to rebut - the circumstances of the loss must be shown and that steps had been taken prior to the loss to avoid the type of loss that did occur. Once that is done, the burden shifts back to the bailor or property owner to show by a  preponderance of the evidence that the precautionary steps taken were not adequate … "  Id.  Since the presumption in bailment cases does nothing more than shift the burden of first production, once the requirements of the presumption are met by the defendant the presumption should disappear from the case and have no bearing on the trier of fact's responsibility to decide the merits of the negligence claim.  Id.

Where a bailee is presumed negligent, rebuttal requires proof of reasonable steps taken to prevent a foreseeable harm.  Bailment claims are a "hybrid" form of dispute sounding in contract but analyzed according to principles of general negligence.  *Masek v. Wichelman*, 2009 Conn. Super. LEXIS 282 (Conn. Super. Ct. Jan. 27, 2009), citing *Barnett Motor Transp. Co. v. Cummins Diesel Engines of Conn., Inc.*, 162 Conn. 59, 63, 291 A.2d 234 (1971).  Since the liability of a bailor or bailee is determined under negligence principles, a pre-requisite of liability for either is the foreseeability of harm, or actual/constructive notice of the defective condition that ultimately causes harm.

Here, BOA has explained the actual circumstances of the flood: an aging pipe within the walls of the banking center failed due to age and deterioration.  The unexpected and unforeseen circumstancs of the flood have been sufficiently demonstrated elsewhere in this brief.  They will

not be repeated here, except to say that BOA has satisfactorily rebutted any presumption of negligence, thusly shifting the burden back to the plaintiff to show BOA's negligence in the first instance. Since that cannot be demonstrated in any way, the plaintiff's bailment claim must be dismissed.

**POINT IV**

**Plaintiff's Breach of Contract Claim Must Be Dismissed Because: (1) the Bank Has Not Breached Any Duty it Owed Under the Contract, and (2) MLC's Claim Is In Essence a Claim of Negligence. Since the Bank Does Not Dispute That it Had a Contract With MLC, MLC's Promissory Estoppel Claim Must Be Dismissed As Well.**

The terms of the Contract between MLC and the Bank are simple:  MLC agreed to pay an annual fee to the Bank, in exchange for which fee the Bank assumed the singular duty to protect MLC's Cabinets from being accessed by any unauthorized person.  Both sides to the Contract have held up its end of the bargain, and none of the Contract's terms have been breached or repudiated.  To the extent that the plaintiff's claimed damages do not flow from a breach of the duty owed by BOA under the contract, the breach of contract claim must fail.

**Breach of Contract Standards**

Under Connecticut law, the elements of a breach of contract are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Rosato v. Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (Conn. App. Ct. 2004) [quoting *Bouchard v. Sundberg*, 80 Conn. App. 180, 189, 834 A.2d 744 (Conn. App. Ct. 2003)].

It is axiomatic that only those damages that flow from or were caused by the breach are recoverable under a breach of contract theory. *IBEW v. Nat'l Elec. Contrs. Ass'n*, 2008 U.S. Dist. LEXIS 25524 (D. Conn. 2008).

When construing a contract, Connecticut courts seek to determine the intent of the parties "from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Isham v. Isham*, 2009 Conn. LEXIS 149 (Conn. 2009). "When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. " *Hare v. McClellan*, 234 Conn. 581, 597, 662 A.2d 1242 (1995); *Poole v. Waterbury*, 266 Conn. 89. "When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact." *O'Connor v. Waterbury*, 286 Conn. 732, 743, 945 A.2d 936 (2008). A contract term will be deemed ambiguous if it is reasonably susceptible to more than one interpretation. *Levine v. Advest, Inc.,* 244 Conn. 732, 746, 714 A.2d 649 (1998); *Rund v. Melillo*, 63 Conn. App. 216, 220, 772 A.2d 774 (2001). When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. *Id.*

"It is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree." *Gibson v. Capano,* 241 Conn. 725, 730, 699 A.2d 68 (1997). This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly,

GOLDBERG SEGALLA LLP
100 Pearl Street, 7th Floor
Hartford, CT 06103-4506

in private disputes, a court must enforce the contract as drafted by the parties and may not relieve

a contracting party from anticipated or actual difficulties undertaken pursuant to the contract."

*Holly Hill Holdings v. Lowman*, 226 Conn. 748, 755-56, 628 A.2d 1298 (1993).  Nevertheless,

contracts that violate public policy are unenforceable. See, e.g*., Solomon v. Gilmore*, 248 Conn.

769, 774, 731 A.2d 280 (1999). "The question of whether a contract is against  public policy is a

question of law dependent on the circumstances of the particular case, over which an appellate

court has unlimited review." *Parente v. Pirozzoli,* 87 Conn. App. 235, 245, 866 A.2d 629 (2005),

citing 17A Am. Jur. 2d 312, Contracts § 327 (2004).

In general, a client may sue a defendant for either breach of contract, negligence or both.

*Conn. Educ. Ass'n, Inc. v. Milliman USA, Inc*., 105 Conn. App. 446, 458, 938 A.2d 1249 (Conn.

App. Ct. 2008). See also *Mac's Car City, Inc. v. DeNigris*, 18 Conn. App. 525, 529-30, 559 A.2d

712 (Conn. App. Ct. 1989). The court must dismiss a claim for breach of contract, however, if

the claim is in fact "a claim that one has breached a standard of care in the language of contract."

*Caffery v. Stillman*, 79 Conn. App. 192, 197, 829 A.2d 881 (Conn. Ct. App. 2003). See also

*Gazo v. City of Stamford*, 255 Conn. 245, 263, 765 A.2d 505 (Conn. 2001)   ("[W]e look beyond

the language used in the complaint to determine what the plaintiff really seeks. . . . [P]utting a

contract tag on a tort claim will not change its essential character.").

Under Connecticut law, where a plaintiff alleges that the defendant "negligently

performed [agreed-upon] services" and "failed to use due diligence," the complaint sounds in

negligence. *Shuster v. Buckley*, 5 Conn. App. 473, 478, 500 A.2d 240 (Conn. App. Ct. 1985). A

breach of contract claim will lie, however, if the plaintiff alleges that the defendant failed to

perform specific actions required of him or her; if the defendant affirmatively refused to perform

certain actions; or if the defendant failed to obtain a specific agreed-upon result. *Weiner v.*

*Clinton*, 106 Conn. App. 379, 385, 942 A.2d 469 (Conn. App. Ct. 2008). See also *Conn. Educ. Ass'n, Inc.*, 105 Conn. App. 446, 938 A.2d 1249 (Conn. App. Ct. 2008) [denying a motion to dismiss a breach of contract claim against an attorney where "[t]he plaintiff's allegations refer to specific actions required by the plaintiff, that is, that the defendant maintain the pension plan in compliance with the Internal Revenue Service code and ERISA"]; *Hill v. Williams*, 74 Conn. App. 654, 659-60, 813 A.2d 130 (Conn. App. Ct. 2003) [denying motion to dismiss a breach of contract claim against an attorney where attorney affirmatively refused to perform actions "in furtherance of the matters for which the defendant had been hired"].

In this case, there was no breach of contract:   MLC agreed to pay an annual fee to the Bank, in exchange for which fee the Bank assumed the singular duty to protect MLC's Cabinets from being accessed by any unauthorized person.  The steps taken  by BOA to prevent unauthorized access were reasonable and effective: the BOA vaults are secured by lock and key, by wired alarms, and are also under digital video surveillance monitored by BOA security teams.  Additionally, the vaults are monitored on a 24-hour a day/ seven day a week basis by ADT for heat variations and motion detection.  Exhibit B at p.5, ¶ 40.  Even more, BOA required MLC to submit access cards to the Bank so that it could properly identify only those persons that MLC wished to have access to its cabinets at BOA.  These steps are not only reasonable precautions to safeguard against the theft of the client property within the cabinets, they actually worked:  in the ten-plus years since MLC has been storing property in the BOA vault, there hasn't been one complaint of unauthorized access or theft.  Since BOA has completely discharged the sole duty imposed by the Contract, it cannot be said to have caused MLC any harm.  Both sides to the Contract have held up its end of the bargain, and none of the Contract's terms have been breached or repudiated.

The factor most fatal to MLC's breach of contract claim is this: MLC continues to store its cabinets on-site at BOA.  Were MLC truly aggrieved under a Breach of Contract theory, it would surely have removed its cabinets on discovery of damage to its client property.  Its continued use of the BOA vault renders all of its claims highly suspect.   This is particularly true given the numerous other storage options that MLC admittedly finds suitable, but nonetheless chooses to ignore. Exhibit D, pp. 106-107.

The fact that the damages suffered by MLC fall outside the scope of any duty imposed by the Contract may be unanticipated and unfortunate, but is not unfair and is no reason to either relieve MLC from its obligations under the Contract or impose upon BOA obligations that do not exist. This Court must enforce the Contract entered into between MLC and BOA, and dismiss MLC's claims accordingly.  Since MLC's claimed damages do not flow from a breach of the duty owed by BOA under the contract, the breach of contract claim must fail.

**Promissory Estoppel Standards**

Since the Bank does not dispute that it entered into a contract with MLC, MLC's claim of promissory estoppels must fail.  The elements of promissory estoppel are: (1) a clear and definite promise which a promisor could reasonably have expected to induce reliance; (2) the party against whom estoppel is claimed must do or say something calculated or intended to  induce another party to believe that certain facts exist and to act on that belief; and (3) the other party must change its position in reliance on those facts, thereby incurring some injury. *Torrington Farms Ass'n. v. Torrington*, 75 Conn. App. 570, 576 n.8, 816 A.2d 736 (2003); *Oski v. Fed. Express Corp.,* 2009 U.S. Dist. LEXIS 93998, 19-20 (D. Conn. Oct. 6, 2009).

Promissory estoppel is properly asserted when there is an absence of consideration to support a contract.  See *Torringford Farms Assn., Inc. v. Torrington*, 75 Conn. App. 570, 576,

816 A.2d 736 ("the doctrine of promissory estoppel serves as an alternative basis to enforce a contract in the absence of competing common-law considerations"),  cert. denied, 263 Conn. 924, 823 A.2d 1217 (2003), citing *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987); see also *Stewart v. Cendant Mobility Services Corp.*, 267 Conn. 96, 110, 837 A.2d 736 (2003) (concluding that jury reasonably could find that there was no offer for purposes of breach of contract claim but that there was promise for purposes of plaintiff's promissory estoppel claim). Connecticut courts have permitted a jury to consider alternative claims for breach of contract and promissory estoppel only when there is an issue as to whether the agreement was too indefinite to allow for contract formation. See *Suffield Development Associates Ltd. Partnership v. Society for Savings*, supra, 243 Conn. 846 (reversing judgment in favor of plaintiff on breach of contract claim on ground that loan amount was indefinite, but remanding for new trial on promissory estoppel claim when jury originally considered claims in alternative and entered verdict on contract claim only); see also *Benedetto v. Wanat*, 79 Conn. App. 139, 151-52, 829 A.2d 901 (2003)  (concluding oral agreement was enforceable under either doctrine of promissory estoppel or as supported by consideration).

In this case, the Bank has admitted that it entered into a Safe Deposit Box Contract with MLC, but claims that it did not breach that contract.  For this reason, there is no need to consider any alternative theory of promissory estoppel, and that claim should be dismissed.

## POINT IV

**MLC's Claimed Violations of the Implied Covenant of Good Faith and Fair Dealing and CUTPA Must Be Dismissed Since The Bank's Failure to Notify MLC of the Flood Was Due To Its Unfamiliarity With MLC, and Not a Malicious Desire to Cause  MLC Harm.**

Claims alleging a violation of either CUTPA or the Implied Covenant of Good Faith require a showing of some particularly egregious or aggravating conduct that exceeds the ordinary concepts of negligence or breach of contract.  Since that type of egregious conduct is missing from this case, plaintiff's claims as to Counts Four and Five must be dismissed.

## CUTPA Violation Standards

The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).  Interpreting the scope of the Act, the Connecticut Supreme Court has stated that "in deciding whether a particular practice is unfair or deceptive under [CUTPA] the legislature has indicated that 'the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts . . . .'" *A. Secondino & Son v. L.D. Land Co.,* 1994 Conn. Super. LEXIS 3374 (Conn. Super. Ct. Dec. 29, 1994); *Web Press Services Corp. v. New London Motors, Inc.*, 203 Conn. 342, 362-63, 525 A.2d 57 (1987).  "The Federal Trade Commission has identified the 'four primary categories of practices which have been prohibited as unfair: (1) intentionally withholding material information to a consumer; (2) making unsubstantiated advertising claims; (3) using high-pressure sales techniques; and (4) depriving consumers of various post-purchase remedies.'" Id. See also *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 216 n.9, 579 A.2d 69 (1999).

Thus, in considering whether a practice violates CUTPA, Connecticut courts have adopted the criteria set forth in the Federal Trade Commission's "cigarette rule": (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;

or (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers, competitors or other businesspersons. *Hartford Electric Supply Co. v. Allen-Bradley Co*., 250 Conn. 334, 736 A.2d 824, 842-43 (Conn. 1999). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice maybe unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Id. at 843.

The Second Circuit observed in *Boulevard Assocs. v. Sovereign Hotels*, 72 F.3d 1029, 1038-1039 (2d Cir. Conn. 1995) that alleged CUTPA violations require proof of a "substantial aggravating factor" to come within the scope of the Act. "The vast majority of courts in Connecticut hold that a simple contract breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." Id. [citing *Chaspek Mfg. Corp. v. Tandet*, 1992 Conn. Super. LEXIS 2122, 1995 WL 447948, at * 12 (Conn. Super. Ct. June 16, 1995)]. See also *Aussenhandel v. Grant AirMast Corp*., 2 Conn. L. Rptr. 590 (Conn. Super Ct. 1990); *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 41 Conn. Supp. 575, 580, 595 A.2d 951, 954 (1991) ["'A simple breach of contract, even if intentional, does not amount to a violation of the Act; a claimant must show substantial aggravating circumstances attending the breach to recover under the Act."]; *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) [discussing similar North Carolina unfair trade practices act]; *Troxler Elec. Labs. v. Palilla*, 1995 Conn. Super. LEXIS 1398, 1995 WL 299599, at * 3 (Conn. Super. Ct. May 10, 1995); *A. Secondino & Son, Inc. v. L.D. Land Co*., 1994 Conn. Super. LEXIS 3374, 1994 WL 728775, at * 2- * 3 (Conn. Super. Ct. Dec. 29, 1994) [recognizing this rule as the

majority position in Connecticut]; *Set to Fit Realty v. First Stamford Corp.*, 1994 Conn. Super. LEXIS 1040, 1994 WL 161346, at * 6 (Conn. Super. Ct. Apr. 19, 1994); *NLRB v. M & M Oldsmobile, Inc.*, 377 F.2d 712, 715 (2d Cir. 1967) [stating that, in context of National Labor Relations Act, breach of contract is "not an *ipso facto* an unfair labor practice"].  In noting the requirement of a substantial aggravating factor, the Second Circuit observed in *Boulevard Assocs. v. Sovereign Hotels*, supra,  that "[a] rule to the contrary -- that a company violates CUTPA whenever it breaks an unprofitable deal -- would convert every contract dispute into a CUTPA violation. We cannot assume that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law." Id., 72 F.3d 1029 at 1038-1039.

## The Implied Covenant of Good Faith & Fair Dealing

It is axiomatic that the duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship.  *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432-33, 849 A.2d 382 (Conn. 2004) ; *LaPlante v. Estano,* 2007 U.S. Dist. LEXIS 31703 (D. Conn. Apr. 19, 2007).   To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. Id.  Bad faith, in general, implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Id. Bad faith means more than mere negligence; it involves a dishonest purpose. Id.

At the outset it must be observed that the facts of this case do not involve intentionally withholding material information to a consumer, making unsubstantiated advertising claims,

using high-pressure sales techniques,  or depriving consumers of various post-purchase remedies. While BOA vigorously contests the plaintiffs claims, they are - at worst – garden variety breach of contract and negligence allegations that do not fall within the realm of conduct CUTPA seeks to regulate.

In addition, there are no aggravating factors are present that would satisfy a bad faith or CUTPA claim.  Mr. Chioffi's belief that BOA acted with malice or evil intent is simply misplaced.

Contrary to Mr. Chioffi's belief that BOA specifically intended to do MLC harm by intentionally keeping the flood a secret, the reality is that BOA didn't even know who MLC was in order to properly notify it of the flood.  Jonathan Schmid and Wilfredo Magan attributed the length of time it took them to notify MLC about the flood to the fact that neither man knew who MLC was, or in which of the three (3) basement vaults MLC stored its cabinets. Exhibit B at pp.7-8; Exhibit G at pp.4-6.  The other entities who utilized the "vault access" service were regular banking customers of BOA who visited the vault quite frequently: at least weekly and sometimes daily. Exhibit B at p.7, ¶¶ 60-61; Exhibit G at p.4, ¶¶ 26-27.  In fact, one of these customers actually visited the banking center to access the vaults on the day the flood was discovered. Exhibit B at p.7, ¶ 62; Exhibit G at p.4, ¶ 28.  In contrast, neither Mr. Schmid nor Mr. Magan had ever personally escorted anyone from MLC down to the vault area in order to access MLC's cabinets. Exhibit B at p.7, ¶ 60; Exhibit G at p.4, ¶ 26.  For this reason, the other law firms who stored cabinets in the vaults were immediately notified about the flood.  Exhibit B at p.7, ¶ 63; Exhibit G at p.4, ¶ 29.  MLC was not a regular banking customer, and visited the vault on a relatively infrequent basis:  the first time MLC visited the banking center to access the cabinets after the flood was three (3) months later, and it was only then that it learned of the

flood's occurrence. <u>Exhibit B</u> at p.8, ¶ 64; <u>Exhibit G</u> at p.4, ¶ 30.  In addition, the record-keeping system used by BOA pertaining to this particular "vault access" arrangement did not specify the particular vault in which firms stored its cabinets. <u>Exhibit B</u>, p.8, ¶ 65; <u>Exhibit G</u>, p.4, ¶ 31. In other words, the records maintained by BOA did not specify that MLC, for example, kept three (3) cabinets in Vault 1, four (4) cabinets in Vault 2, and two (2) cabinets in Vault 3.   <u>Id.</u>  Instead, the records merely indicated that cabinets were kept in the vaults, and indentified who was authorized to access those cabinets.  <u>Id.</u> For this reason, too,  neither Schmid nor Magan were aware that MLC had stored cabinets in the vault that flooded. <u>Exhibit B</u> at p.8, ¶¶ 66-67; <u>Exhibit G</u> at p.5, ¶ 33.

Any lapse in time between the flood and MLC learning of it is attributable solely to the fact that no one at the BOA banking center was familiar enough with MLC as an entity to notify it immediately that the flood had taken place.  <u>Exhibit B</u> at p.9, ¶ 69; <u>Exhibit G</u> at p.5, ¶ 35.  In short, BOA did  not know enough about MLC to even identify it as a vault customer, let alone to wish MLC harm in any way. <u>Id.</u>

Neither Mr. Magan nor Mr. Schmid harbor any ill will, malice or other hostile intent toward MLC, counts Four and Five must be dismissed.

## CONCLUSION

Wherefore, for the following reasons, defendant BANK OF AMERICA respectfully requests that the plaintiff's Complaint against it be dismissed in its entirety.

Respectfully Submitted,
BANK OF AMERICA, NA

_____/s/ Brian T. Stapleton_____
By: Brian T. Stapleton, Esq. (CT13418)

GOLDBERG SEGALLA LLP
100 Pearl Street, 7th Floor
Hartford, CT 06103-4506

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Memorandum of Law** was filed with the U.S. District Court for the District of Connecticut electronically via the District Court's CM/ECF filing system on the 30th day of November, 2009, and that pursuant to such filing a true and correct copy of the filed document was automatically and electronically served on the following CM/ECF participant. In addition, a true and correct copy of the foregoing was served upon the following by deposit in the United States mail, first class postage prepaid, this 30th day of November, 2009:


MARTIN, LUCAS & CHIOFFI, LLP
Mr. Scott Lucas, Esq.
177 Broad Street
Stamford, CT 06901
*Attorneys for Plaintiff*


_____/s/ Brian T. Stapleton_____
Brian T. Stapleton, Esq. (CT13418)