## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARTIN, LUCAS & CHIOFFI, LLP, | : | |
| | : | |
| Plaintiff, | : | |
| | : | No. 3:08cv1388 (MRK) |
| v. | : | |
| | : | |
| BANK OF AMERICA, NATIONAL | : | |
| ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |

### RULING AND ORDER

Defendant, Bank of America ("BOA" or "the Bank"), has moved for summary judgment on all claims brought by the Plaintiff, Martin, Lucas & Chioffi, LLP, a law firm ("Martin Lucas"). The law firm's claims arise from a flood of a BOA vault in June 2007 that resulted in significant damage to original legal documents that Martin Lucas stored there. Martin Lucas has asserted claims of breach of contract (Count One); promissory estoppel (Count Three); negligence/bailment (Count Four); and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (Count Five).[1]  *See* Compl. [doc. # 1].  Following the close of discovery, BOA filed a Motion for Summary Judgment [doc. # 39].  For the reasons that follow, BOA's Motion for Summary Judgment is GRANTED as to the claim of promissory estoppel, but is DENIED as to Counts One, Four, and Five.

---

[1] Martin Lucas also asserted a claim of breach of the covenant of good faith and fair dealing, *see* Compl. [doc. # 1] ¶¶ 25-27, but in its memorandum in opposition to Defendant's motion for summary judgment, the law firm abandoned that claim, *see* Pl.'s Mem. in Opp'n to Summ. J. [doc. # 47] at 25 n.5, and BOA is therefore granted summary judgment as to Count Two.

**I.**

The Court assumes the parties' familiarity with the factual background and procedural history to date, and recites only those facts necessary for the resolution of BOA's motion. The following facts are taken from the parties' statements of material facts not in dispute. *See* Def.'s Local Rule 56(a)1 Statement [doc. # 40]; Pl.'s Local Rule 56(a)2 Statement [doc. # 48]; Def.'s Resp. to Pl.'s Local Rule 56(a)2 Statement [doc. # 53]. Unless otherwise indicated, these facts are undisputed. The Court will introduce other facts as necessary in its discussion of the individual claims.

On November 30, 1999, Martin, Lois & Gasparrini, LLP (the predecessor of Martin Lucas) entered into a "Safe Deposit Box Contract" with Fleet National Bank (which was later acquired by BOA). *See* Safe Deposit Box Contract [doc. # 40-4]. Under the agreement, and for a monthly fee, Fleet agreed to store three of Martin Lucas's file cabinets in a secure vault in the basement of its Greenwich, Connecticut branch. These file cabinets contained original legal documents of the law firm's clients, mostly relating to estate planning. The bank's vault area contains multiple rooms, and in addition to traditional safe deposit boxes, the Bank also stores there the file cabinets of several other businesses (including other law firms). The Bank did not have keys to open the law firm's file cabinets, but it did restrict access to the file cabinets: the Plaintiff was required to submit and periodically update a "Safe Deposit Box Certificate of Access and Indemnification," listing the names of the particular individuals who had permission to access the file cabinets. As part of the agreement, when individuals arrived at the Bank and requested to be let into the vault area to access the filing cabinets, Bank employees would ensure that their names appeared on the Certificate of Access. The only other access restriction was that those wishing to visit the vault must come during the Bank's regular business hours.

2

This arrangement appears to have continued without incident for nearly eight years, even after Fleet was acquired by BOA in 2004.  However, on or about June 8, 2007, a water pipe located in the ceiling above the vault burst, causing at least one room of the vault – the room containing Martin Lucas's file cabinets, as well as those of two other law firms – to flood.  A Bank employee discovered the flooding the next morning, a Saturday, when he went to open the vault for the day.  The Bank immediately called a maintenance crew, which arrived later that day and vacuumed out the water; placed large fans and a dehumidifier in the vault to remove excess moisture; and covered the file cabinets – which had become wet – with tarps.  The cleanup of the vault continued for several days.

During this time, however, no one from the Bank contacted any of the three law firms to inform them of the burst pipe or possible damage to their files.  Luckily for the other two firms, representatives from their respective offices visited the vault the week after the pipe burst, at which point they discovered the water damage on their own.  *See* Tr. of Jonathan Schmid Dep. [doc. # 47-6] at 30:9-13.  At least one of those firm's documents had been affected by the water; when the firm discovered the beginnings of mold growth in July 2007, it hired a document restoration company, Munters Moisture Control Services ("Munters"), which was able to salvage all of the firm's documents.  *See* Decl. of Virginia Graham [decl. # 47-4] ¶¶ 5-6.  Unfortunately for Martin Lucas, no one from the law firm visited the vault until September 5, 2007 – some three months after the burst pipe occurred.  At that time, the law firm discovered that its documents were damp and suffering from significant mold growth.  Though BOA concedes that it made no effort to inform Martin Lucas of the burst pipe or potential water damage until the law firm made the discovery on its own, the Bank explains that this was due to the fact that its records did not specify which room in

3

its vault contained Martin Lucas's cabinets.  *See* Aff. of Jonathan Schmid [doc. 40-3] ¶ 65.  Martin Lucas argues that even if this is true, its file cabinets were clearly labeled with the firm's name and contact information.  *See* Aff. of Mark P. Chioffi [doc. # 47-5] ¶ 10.

Within days of discovering the damage, Martin Lucas hired Munters to attempt to salvage its documents, but an unspecified number of them were irrevocably damaged.  Martin Lucas says that some of the documents had original signatures washed away, and that replacing them required the firm's clients to re-execute those estate planning documents.  In this suit, the law firm seeks to be reimbursed for the time expended re-executing those documents.  It also seeks statutory damages under the CUTPA; punitive damages; interest; and attorneys' fees and costs.

## II.

The purpose of summary judgment is not to resolve factual disputes, but rather to determine whether there *are* any genuine disputes about facts material to a claim that must be resolved at trial. For that reason, summary judgment is only appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

4

As the moving party, BOA bears the burden of demonstrating that no genuine dispute of material fact remains, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and as the non-moving party, Martin Lucas gets the benefit of all ambiguities being resolved, and all inferences drawn, in its favor, *see Anderson*, 477 U.S. at 255; *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials."  Fed. R. Civ. P. 56(e)(2).  Instead, the opposing party must "set out specific facts showing a genuine issue for trial."  *Id.*  In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.

A threshold question in this case is whether an exculpatory clause contained in the Bank's Safe Deposit Box Rules and Regulations applies to the parties' agreement.  BOA argues that the clause – which disavows liability for everything but the Bank negligently permitting unauthorized persons access to the box – not only applies, but that it entitles BOA to summary judgment on all of Martin Lucas's claims.  *See* Def.'s Mem. in Supp. of Mot. for Summ. J. [doc. # 41] at 2-13.  The Court disagrees.

The primary problem with BOA's argument is that it has not presented evidence that Martin Lucas was ever made aware of the exculpatory clause.  The clause was not a part of the parties' contract; it was contained in separate "rules and regulations" that purportedly governed the Bank's safe deposit box contracts.  And while the contract signed by the Martin Lucas representative does

reference "Rules and Regulations," BOA has, to date, been unable to produce the Rules that were in effect at the time the contract was signed by the parties.  In fact, there is no evidence in the record that the Rules in effect in November 1999 (when the agreement was signed) even had an exculpatory clause.  Nonetheless, BOA argues that an exculpatory clause contained in amended "Rules and Regulations," issued long after the contract was signed, bars Martin Lucas's claims.  *See* Fleet Rules & Regs. dated Aug. 2000 [doc. # 40-4] ¶ 1 ("[T]he Bank's only duty will be to use ordinary care to prevent unauthorized persons from gaining access to the Safe Deposit Box.  We will not be liable to you, unless we fail to exercise ordinary care in restricting Safe Deposit Box access to Authorized Persons during the term of your lease.").[2]

While the Bank concedes that there is no evidence that Martin Lucas actually saw the amended Rules and Regulations, it argues that this does not matter, as Martin Lucas agreed in the Safe Deposit Box Contract that the Rules and Regulations could be changed at any time without notice.  *See* Def.'s Reply Mem. [doc. # 54] at 1-2 ("Although plaintiff complains that it was never shown a copy of these amended rules, BOA was not required to show [Martin Lucas] the amended rules in order for them to be effective: under the terms of original contract signed by Christopher Martin, [Martin Lucas] agreed to be bound by the Bank's Rules and Regulations, as amended from time to time, and without notice to [Martin Lucas].").  The Safe Deposit Box Contract does contain language to this effect, *see* Safe Deposit Box Contract [doc. # 40-4], but enforcing an exculpatory

---

[2] As BOA's counsel conceded at oral argument, the Rules & Regulations that were actually in effect at the time the time pipe burst obligated the Bank "to exercise ordinary care to prevent damage to or unauthorized access to the Box."  BOA Rules & Regs. dated Apr. 2005 [doc. # 53] at 2.  Given that Martin Lucas did not actually rent a safety deposit "box" from the Bank, it is not clear what exactly this provision would require of BOA within the context of this case.  But even assuming that these Rules did apply – and, as discussed, BOA has not presented sufficient evidence to conclude that they did – this ambiguity would be for the jury to resolve.

clause against a party that did not have notice of it – which the Court must assume on summary judgment, given the absence of evidence to the contrary – would violate well-established Connecticut law on the enforcement of exculpatory clauses, such as this one, that purport to excuse a party of his or her own negligence.

The Connecticut Supreme Court has long emphasized that "the law does not favor contract provisions which relieve a person from his own negligence." *Hyson v. White Water Mountain Resorts of Conn., Inc.*, 265 Conn. 636, 643 (2003) (quoting *Griffin v. Nationwide Moving & Storage Co.*, 187 Conn. 405, 414 (1982)).  Accordingly, that court requires that any such clause be sufficiently clear that "an ordinary person of reasonable intelligence would understand that, by signing the agreement, he or she was releasing the defendants from liability for future negligence." *Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314, 324-25 (2005).  As the Bank points out, this standard is relaxed somewhat when both parties are sophisticated, as is the case here.  *See B & D Assocs. v. Russell*, 73 Conn. App. 66, 73 (2002) ("When applied to contracts to which the parties are sophisticated business entities, the law, reflecting the economic realities, will recognize an agreement to relieve one party from the consequences of his negligence on the strength of a broadly worded clause framed in less precise language than would normally be required, though *even then it must evince the unmistakable intent of the parties . . . .*") (citation and quotation marks omitted, emphasis added).  But that principle does not support the conclusion implicit in BOA's argument – that a sophisticated party can be bound by exculpatory language that it never saw.  *See id.*  BOA's argument that the exculpatory clause bars recovery thus fails.[3]

---

[3] Moreover, even if Martin Lucas did have notice of the exculpatory clause, given that this was a bailment contract (as discussed *infra*), it appears likely that the clause would be void as against public policy under Connecticut law.  *See Griffin*, 187 Conn. at 413 ("We have held that the right of

## IV.

The other threshold issue in this case is whether the parties' arrangement – whereby the Bank agreed to store the law firm file cabinets in its vault for a monthly fee – constitutes a bailment.  For the reasons that follow, the Court concludes that it does.

"A bailment 'involves the delivery of the thing bailed into the possession of the bailee, under a contract to return it to the owner according to the terms of the agreement.'"  *B. A. Ballou & Co. v. Citytrust*, 218 Conn. 749, 753 (quoting *Seedman v. Jaffer*, 104 Conn. 222, 226 (1926)); *see also id.* at n.2.

> A relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions.  In bailment, the owner or bailor has a general property [interest] in the goods bailed . . . .  The bailee, on the other hand, has mere possession of items left in its care pursuant to the bailment.

*Id.* at 749 (citations and quotation marks omitted, alterations in original).  Since it has asserted the existence of a bailment, Martin Lucas has the burden of proving the facts necessary to establish that this was a bailee-bailor relationship.  *See id.* at 752.  The law firm has done so.

Depositing items in a rented safe deposit box at a bank is generally considered a bailment.  *See* 1 Kenneth M. Lapine et al., *Banking Law* § 10.03 ("The relationship between a bank and its customer renting a safe deposit box is that of bailee and bailor . . . .").  Though the contract here was, in fact, titled "Safe Deposit Box Contract," BOA argues that this was not a bailment because Martin

---

a bailee to limit his liability by special contract does not extend to relieve him wholly against his own negligence, for to do so would be against public policy."); *Malone v. Santora*, 135 Conn. 286, 293 (1949); *Welch v. Boston & A. R. Co*., 41 Conn. 333, 341 (1874); *Arruda v. Donham*, No. CV 930520972S, 1994 WL 386092, at *2 (Conn. Super. Ct. July 11, 1994) ("In a bailment case the bailee has custody and control over the property.  It would be offensive to public policy to permit the

Lucas "never relinquished exclusive control over the cabinets or their contents to BOA."  Def.'s Mem. in Supp. [doc. # 41] at 24.  In support of its argument, BOA cites two cases, s*ee* Def.'s Mem. in Supp. of Mot. for Summ. J. [doc. # 41] at 22-25; both are inapposite.

The first, *Bobryk v. Lincoln Amusements*, No. CV950547084S, 1996 WL 24566, at *19 (Conn. Super. Ct. Jan. 5, 1996), involved circumstances dramatically different from those presented here.  In *Bobryk*, a minor child was injured while riding a carnival ride called the "Flying Chairs".  She subsequently sought to recover on the basis of, *inter alia*, the Connecticut Products Liability Act (CPLA), Conn. Gen. Stat. § 52-572-m, which applies to "sellers" of products.  While Superior Court Judge Michael Sheldon found that the CPLA definition of "sellers" applies to lessors and bailors, he held that the carnival ride had been neither leased nor bailed to the minor.  *See* 1996 WL 24566, at *5 ("[T]he defendant never bailed the Flying Chairs to the plaintiff-minor since it never relinquished control of them to her at any time.").

BOA argues that the same is true here – that since it could not open the file cabinets, the law firm had not relinquished "exclusive control" of the cabinets, and therefore this is not a bailment.  But BOA reads far too much into the requirement of "exclusive control," essentially conflating it with a requirement of "complete access."  As BOA's argument would seem to require, a bailment would never exist unless the alleged bailor had complete access to every nook, cranny, and compartment of the bailed property.  But that is not the law.  In fact, there is no requirement that a bailee even have *knowledge* of what, precisely, has been bailed – much less complete access to all parts of it.  *See, e.g.*, *Rheaume v. Fleet Boston Fin. Corp.*, No. CV030564496S, 2005 WL 3370493, at *22-23 (Conn. Super. Ct. Nov. 16, 2005) ("[S]afe deposit boxes do create a relationship between

bailee in such a situation to relieve itself of the consequences of its own negligence.").

the customer, as bailor, and the bank, as bailee *'even though the bank has no knowledge as to the property deposited.'"*) (quoting *Farnum v. Conn. Bank & Trust Co.*, 22 Conn. Supp. 257, 261 (1960) (emphasis added); *Bek v. Shawmut Bank Conn., N.A.*, No. CV 940314532S, 1996 WL 383326, at *3 (Conn. Super. Ct. May 16, 1996) (same); *see also* 1 Banking Law § 10.03 ("This relation of bailee-bailor is not disturbed by the fact that the safe deposit company does not know, and is not expected to know, the character or description of the property that is deposited in a safe deposit box or safe, *any more than the relationship is changed if a bailee receives a trunk for safekeeping from a bailor, and the trunk is locked and the key retained by the bailor. . . ..*") (emphasis added).

The second case cited by BOA, *Mac-aire Aviation Corporation v. Corporate Air, Inc.*, 6 Conn. Cir. Ct. 238 (1970) – which held that there was no bailment – actually demonstrates well why there *was* a bailment in this case.  The defendant in *Mac-aire* rented hangar space from the plaintiff in order to store its airplanes.  While the plaintiff argued that the hangar space was leased to the defendant, making the relationship that of landlord-tenant, the defendant argued that it was a bailment, with the planes being the bailed property.  In agreeing with the plaintiff, the court found two factors particularly relevant.  First, the court noted that in a prior, aborted action between the same parties, the defendant had described the relationship in its pleadings as a lease, which the court found "relevant and persuasive as judicial admissions that it was in fact a tenant of the plaintiffs." *Id.* at 252.  Second, on the merits of the bailment argument, the court noted that the "essential element of bailment" – control over the allegedly bailed items – was missing.  *Id.*  In particular, the court noted that the defendant retained total control over the airplanes, as it was able (and did) move the airplanes within the hangar and moved them in and out of the hangar at its pleasure, and without needing the permission or participation of plaintiffs. *See id.*  The court cited to *Malone v. Santora*,

10

mentioned earlier, and analogized the situation to an automobile parking garage.  *See id.* at 253.  In those situations, the Connecticut courts recognize a distinction between "a car owner merely hir[ing] a place to put his car" – a lease – and "turn[ing] its possession over to the care and custody of the lot operator" – a bailment.  *Id.* at 252-53.

Applying those same principles to this case, the Court has no trouble concluding that this was a bailment.  Unlike the planes in *Mac-Aire*, Martin Lucas could not even access its file cabinets without the permission and active participation of Bank personnel.  BOA restricted access to not just to the building, but also the bank vault, and even the file cabinets themselves, in that it required the law firm to designate particular people to have access and took upon itself the duty to ensure only those people gained access.[4]  BOA's arguments that this was not a bailment are simply erroneous.

## IV.

While based on contract, bailment claims are evaluated according to negligence principles.  "In the care of property, the bailee's contractual obligation is to exercise due care for the safekeeping of the bailed property, and, so, essentially, when loss or damage occurs, liability is based on negligence, even though negligence constitutes a breach of contract."  *Barnett Motor Transp. Co. v.*

---

[4] The Bank also implies an additional argument by stating that "[a] bailment may not exist when the goods entrusted to a party properly are intermingled or commingled with goods belonging to others."  Defs.' Mem. in Supp. [doc. # 41] at 22.  BOA cites *B.A. Ballou & Co.*, 218 Conn. 749 (1991), for this proposition.  However, not only did *Ballou* involve *fungible* goods, but the court in that case explicitly held that "the commingling of fungible goods alone does not defeat a bailment when the bailor specifically intended to retain ownership of a known share of the commingled goods."  *Id.* at 754.  *See also Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 420 (2007) ("If the purported bailee is not bound to return the same items that were delivered to him by the bailor, but may deliver any other item or items of equal value, there is no bailment.").  That is clearly not the situation here, as it would have mattered a great deal if Martin Lucas had bailed its clients documents but received another firm's documents back in return.

*Cummins Diesel Engines, Inc.*, 162 Conn. 59, 63 (1971).  Bailment claims are to proceed according to a burden-shifting framework:

> The failure of a bailee to return goods delivered to him raises a presumption that their nonproduction is due to his negligence. This presumption prevails unless and until the bailee proves the actual circumstances involved in the damaging of the property.  If those circumstances are proved, then the burden is upon the bailor to satisfy the court that the bailee's conduct in the matter constituted negligence. The circumstances which the bailee must prove must be something more than those indicating the immediate cause of the damage. The proof must go so far as to establish what, if any, human conduct materially contributed to that immediate cause. The isolated fact of destruction by fire or of loss by theft rebuts nothing.  The bailee must prove something more if he is to overcome the presumption. He must prove the actual circumstances connected with the origin of the fire or the theft, and these include the precautions taken to prevent the loss. . . . [T]he presumption in favor of the bailor continues until the bailee not only produces *substantial contravening evidence* but proves the actual circumstances involved in the loss of the property. Whether the bailee has proved the actual circumstances of the loss and rebutted the presumption of negligence in that the bailee has taken reasonable precautions under the circumstances is a question of fact for the trier.

*Griffin*, 187 Conn. at 409-10 (internal quotation marks and citations omitted, emphasis in original). In this case, BOA has come forward with the immediate cause of the damage to the law firm's files: the water caused by the bursting pipe.  That said, the Bank has produced little, if any, evidence regarding what precautions it took to prevent the pipe from bursting in the first place.  For example, there is no evidence about inspections of the Bank's plumbing or the vault's capability to resist flooding.  *See Aetna Casualty & Surety Co. v. Poppel & Sons Serv. Stat., Inc.*, 142 Conn. 598, 604-05 (1955) (upholding a decision that the defendant had successfully rebutted the presumption of negligence, and explaining that "the defendant . . . prove[d] something more than the isolated fact of destruction [of a bailed vehicle] by fire. . . . [T]he evidence furnished a detailed description of the construction and appearance of the defendant's service station.  The manner in which it was maintained and the precautions taken against creating fire hazards were narrated. . . . The defendant

12

proved, as required, the actual circumstances connected with the origin of the fire, and these included the precautions taken to prevent the loss."); *see also* 8A Am Jur 2d Bailments § 123 ("[W]here the bailed property is threatened by fire, flood, or other disasters, the bailee will be liable for a failure to make every reasonable effort to save the property.").  Nor is there any evidence to show what precautions the Bank took after the pipe burst to prevent damage to Martin Lucas's files; indeed, all of the evidence is that the Bank took no precautions at all.

The only evidence that BOA has submitted in support of its conduct is the testimony of the Greenwich branch manager, Mr. Schmid, who avers that the Bank had not had problems with burst pipes before and that he did not know that there was a pipe above the vault.  While a jury may ultimately conclude that the Bank took reasonable precautions to prevent such flooding, the scant evidence presented thus far hardly compels that conclusion.  Therefore, BOA is not entitled to summary judgment on this ground.

BOA's final two arguments for summary judgment on the bailment claim – that Martin Lucas cannot prove the elements of duty or causation – are similarly without merit.  The Bank's argument regarding duty asserts that it owed no duty to prevent damage via flooding because it did not know of the aging pipe's imminent bursting.  BOA argues that "[t]he Connecticut Supreme Court has repeatedly stated that the notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it."  Def.'s Mem. in Supp. [doc. # 41] at 14-15.  BOA further argues that, with regard to notice, "the trier's consideration must be confined to the defendants' knowledge of the specific condition causing the injury, and such knowledge cannot be found to exist from a knowledge of the general or overall conditions obtaining on the premises."  *Id.* at 15.

13

BOA's argument here is taken verbatim from *Monahan v. Montgomery*, 153 Conn. 386, 390 (1966).  There, the Supreme Court overturned a jury verdict for a decedent's estate on a claim of negligence related to dead leaves and branches that allegedly caused the decedent to trip and fall, leading to his death.  While acknowledging the difficulties inherent in proving the circumstances of an accident whose only eyewitness was the decedent himself, the court found that there "was no evidence from which the jury could reasonably conclude that the claimed specific defect had existed for such a sufficient length of time that the defendant should have discovered it in the exercise of a reasonable supervision of her premises or to what extent it was a material factor in causing the injuries which the decedent sustained."  *Id*. at 392-93.  Crucial to this holding, however, was the fact that at the time he tripped, the decedent himself was in the process of raking and removing the leaves and branches that allegedly caused his fall.  *See id.* at 392.  The court held that even if there were dangerous conditions present, the defendant could not have had notice of them because the decedent himself was in the process of changing them.  *See id.* ("[W]hatever the conditions on the defendant's premises may have been before the decedent himself undertook to change them, it is undisputed that he did himself intentionally and materially change them and in fact was in the process of changing them when he in some undisclosed manner tripped over a branch and fell.").

The situation here is far different.  BOA has explained that the pipe burst due to simple age; if that is the case – and there is certainly no evidence before the Court to suggest that it was or was not the case – then the pipe was likely in an advanced state of deterioration for quite some time before finally giving out.  Reliance on cases like *Monahan*, therefore, is misplaced, as it involved rapidly-changing conditions with no opportunity for the defendant to become aware of the dangerous conditions.

14

Moreover, BOA's argument ignores the contractual obligations that it assumed by virtue of the bailment itself.  "In the care of property, the bailee's contractual obligation is to exercise due care for the safekeeping of the bailed property . . . ."  *Barnett*, 162 Conn. at 63 (1971).  As a bailee, BOA's duty was to return the property undamaged to the bailor.  *See id.*; *H.J. Kelly & Assocs. v. City of Meriden*, No. CV030285781, 2008 WL 496688, at *10 (Conn. Super. Ct. Jan. 17, 2008).  The fulfillment of the bailor's duty generally requires it to inspect the premises to ensure they are appropriate for storing the bailed items, *see* 8A Am Jur 2d Bailments §§ 119, 127; and storing bailed items in a location that exposes them to a risk that was not known to the bailee can be a violation of that duty, *see, e.g.*, *Miller v. Greyvan Lines, Inc.*, 130 N.Y.S.2d 378, 381 (1954) (holding that the bailor had not waived any breach of a bailment contract when the defendant moved the bailed items from a location the defendant said was fireproof to one that was not, even though plaintiff did not object to the move, because plaintiff did not know that the second location was not fireproof), *aff'd* 308 N.Y. 853 (1955).  In sum, BOA had a legally-imposed duty to safeguard Martin Lucas's property from precisely the type of danger to which it was ultimately exposed.

BOA's final argument for summary judgment on the bailment claim, on causation, is also unpersuasive.  The Bank argues that the law firm cannot prove that the damage done to its documents – in particular, the washing away of signatures – was caused by the three-month delay between the flood's occurrence and Martin Lucas becoming aware of it.  The Bank argues that Martin Lucas "must prove that the signatures weren't immediately destroyed in the hours before [a Bank employee] first discovered the flood after opening the banking center for business."  Def.'s Mem. in Supp. [doc. # 41] at 17.  "These showings," BOA says, are complicated issues, involving matters "beyond the realm of a juror's ordinary experience and understanding," such as "the water

15

solubility of ink and the nature of the paper it was printed on." *Id.* BOA avers that these matters require expert testimony to be resolved, and that Martin Lucas's failure to designate an expert means it cannot meet its burden regarding factual causation. *See id.*

There are two problems with this argument. First, it seems to be premised on the assumption that BOA can only be held liable for the delay in notifying Martin Lucas, and that it *cannot* be held liable for any damage caused in the immediate aftermath of the pipe's bursting. For the reasons explained above, this assumption is unwarranted, at least on summary judgment. Second, even assuming that BOA could not be held liable for the initial bursting of the pipe, the Court cannot say, as a matter of law, that expert testimony is required to show factual causation, and BOA does not cite any case for the proposition that it is.

BOA does not dispute that at least one other law firm, Cummings & Lockwood, had file cabinets full of documents that were similarly drenched by the burst pipe, or that Cummings & Lockwood was able to salvage its documents. Martin Lucas has submitted a sworn statement from Virginia Graham, Cummings & Lockwood's office administrator. *See* Decl. of Virginia Graham [doc. # 47-4]. Ms. Graham states that in late July 2007 – about the midway point between the burst pipe and Martin Lucas discovering it – the firm "noted dampness and the beginning of mold growth on some of our documents. [Cummings & Lockwood] retained Munters to help preserve its clients' original documents and minimize any damage to them." Decl. of Virginia Graham [doc. # 47-4] ¶ 5. "As a result of the efforts of Munters, none of [Cummings & Lockwood]'s clients' documents were so severely damaged as to require the client to re-execute those documents." *Id.* ¶ 6. However, Martin Lucas documents *were* severely damaged, even though it also hired Munters to try to salvage its documents. *See* Aff. of Mark Chioffi [doc. # 47-2] ¶ 13. Given the parallel circumstances

16

involving Cummings & Lockwood and Martin Lucas's documents, a jury could reasonably infer that the lapse in time was a substantial factor in causing the disparate results – particularly in the absence of any evidence that there were any differences between Martin Lucas's documents and those of Cumming & Lockwood.  While the Court agrees that expert testimony would likely be helpful to the jury, it cannot say that it is required as a matter of law.

In sum, because there are disputed issues of material fact as to Martin Lucas's bailment claim, BOA's Motion for Summary Judgment [doc. # 39] on that claim is DENIED.  The Court sees no reason, however, for Martin Lucas to proceed under both its breach of contract claim (Count One) and its negligence/bailment claim (Count Four).  Though there may be circumstances where it is important for a plaintiff to maintain both a contract and a tort theory of liability – if, for example, a different statute of limitations applies to each, *see H.J. Kelly & Assocs.*, 2008 WL 496688, at *10 – that does not appear to be the case here.  Moreover, experience cautions that charging a jury on both a tort claim of negligence and a contract claim whose breach is measured by a negligence standard (as in bailment contracts) can cause profound confusion.  *See, e.g.*, *Barnett*, 162 Conn. at 63.  Therefore, unless Martin Lucas can articulate a reason for maintaining separate counts, the jury will be charged only once on the claim based on BOA's alleged breach of a bailment contract (Count Four).

Additionally, since BOA does not dispute the existence of a valid contract, its Motion for Summary Judgment [doc. # 39] as to Count Three, alleging promissory estoppel, is GRANTED. There are circumstances under which Connecticut courts permit claims of promissory estoppel to go forward as an alternative to a contract claim, *see Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 88 (2005), but Martin Lucas has not identified any such circumstances here.

## V.

The Court next considers the Defendants' Motion for Summary Judgment [doc. # 66] on the CUPTA claim.  To determine whether particular conduct constitutes an unfair or deceptive trade practice within the meaning of the CUPTA, courts must apply the "cigarette rule," which asks:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statute, the common law, or otherwise – whether, in other words, it is in at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . . All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

*Jacobs v. Healey Ford Subaru, Inc*., 231 Conn. 707, 725 (1995) (citations and internal quotation marks omitted).  Whether a particular practice is unfair is generally a question of fact, *see DeMotses v. Leonard Schwartz Nissan, Inc*., 22 Conn. App. 464, 466 (1990), and courts must "liberally construe[]" the CUTPA "in favor of those whom the legislature intended to benefit," *Fink v. Golenbock*, 238 Conn. 183, 213 (1996) (citation and quotation marks omitted).

Martin Lucas readily, and rightly, concedes that the initial pipe bursting could not support a CUTPA claim.  Nevertheless, the law firm argues that the Bank's "egregious failure" to notify it of the potential water damage "is precisely the type of aggravating circumstance given the fiduciary nature of the bailor/bailee relationship, so as to offend public policy and be considered an unfair trade practice."  Pl.'s Mem. in Opp'n [doc. # 47] at 25.  BOA, for its part, argues that its failure to notify Martin Lucas of the burst pipe was due to an unfamiliarity with the law firm. BOA also argues that its conduct was not due to any malicious desire to cause Martin Lucas harm, *see* Def.'s Mem. in Supp. [doc. # 41] at 36, but a malicious intent is not necessarily required for a CUTPA claim.  *See Normand Josef Enter., Inc. v. Conn. Nat'l Bank*, 230 Conn. 486, 523 (1994) ("[A] party need not

18

prove an intent to deceive to prevail under CUTPA.").

Upon careful consideration, the Court is unable to conclude that it can rule for BOA on the CUPTA claim as a matter of law. "Connecticut common law has always recognized a special relationship of trust and strict obligations of care between a bailor and a bailee for hire," and at least one court has held that a serious violation of that trust can support a CUTPA violation. *Zelencich v. Am. Yacht Servs., No.* CV020187145S, 2006 WL 2411471, at *6 (Conn. Super. Ct. July 31, 2006). What is more, a reasonable jury could conclude that when the burst pipe occurred, the Bank had a duty to disclose that fact to Martin Lucas – and the failure to disclose when under a duty to do so can constitute a CUTPA violation. *See Willow Springs Condominium Ass'n, Inc. v. Seventh BRT Dev. Corp.*, 245 Conn. 1, 43-44 (1998) ("Although a failure to disclose can constitute a CUTPA violation, it will do so 'only if, in light of all the circumstances, there is a duty to disclose.'") (quoting *Normand Josef Enterprises*, 230 Conn. at 523)); *see also DeMotses v. Leonard Schwartz Nissan, Inc.*, 22 Conn. App. at 467 ("In the present case, it is apparent that the parties are not in agreement on whether the defendant's failure to disclose and discuss the terms on the back of the contract was an unfair or deceptive practice. Therefore, the case must be remanded for a trial on the merits of the plaintiff's CUTPA claim."). The Court is not prejudging this claim and the evidence at trial may show that it should not be sent to the jury. BOA will be entitled to renew its arguments at trial in the form of a motion under Rule 50 of the *Federal Rules of Civil Procedure*. For now, however, the Court is satisfied that summary judgment is not appropriate on this claim.

19

**VI.**

For the foregoing reasons, Bank of America's Motion for Summary Judgment [doc. # 39] on Count Three, alleging promissory estoppel; and Count Two, alleging breach of the covenant of good faith and fair dealing, is GRANTED; but its Motion is DENIED as to Counts One, Four, and Five. **The Court will issue a trial scheduling order separately.**

IT IS SO ORDERED.

/s/  Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: May 7, 2010.**